Patsy **JAMISON,** Administratrix of the Estate of Daniel Jamison, Deceased, Plaintiff,

v.

**STORER BROADCASTING COMPANY,** an Ohio Corporation, Defendant.

Civ. A. No. 77–72111.

United States District Court, E. D. Michigan, S. D.

April 8, 1981.

Michael Materna of Zeff & Zeff, Susan Roche, Detroit, Mich., for plaintiff.

John C. O'Meara, Henry W. Saad, Dickinson, Wright, McKean, Cudlip & Moon, Detroit, Mich., for defendant.

## OPINION AND ORDER GRANTING IN PART, DENYING IN PART MOTION FOR JUDGMENT NOTWITHSTANDING VERDICT, GRANTING MOTION FOR NEW TRIAL, AND DENYING MOTION FOR SUMMARY JUDGMENT

PATRICIA J. BOYLE, District Judge.

This litigation involves the allegedly discriminatory discharge of Mr. Daniel "Red" Jamison by Storer Broadcasting Company, WJBK–TV, in April of 1977 and injury thereafter sustained by Mr. Jamison as an alleged result of the discharge. Mr. Jamison, a white male, worked at WJBK as a television sportscaster until he was discharged and replaced on the air by a black male, Mr. Charles Neal. Following his discharge, he commenced an action against his former employer alleging racial discrimination in violation of applicable Michigan law. The matter is before this court on diversity jurisdiction. 28 U.S.C. § 1332.

After the discrimination action was commenced and discovery had been taken, including the discovery deposition of Mr. Jamison, Mr. Jamison committed suicide in Tennessee. Over vigorous objection from the defendant, the court permitted Ms. Patsy Jamison (Vaughn), as administratrix of the estate, to be substituted as plaintiff in behalf of Mr. Jamison's minor sons and allowed amendment of the complaint to include allegations of wrongful death.

Prior to trial defendant's motion to bifurcate the proceedings was granted on the ground that evidence of damages relating to the wrongful death claim would unduly prejudice the determination of liability. Extensive use was made of deposition testimony at trial, including use of the deposition of Mr. Jamison before his death. The jury found for plaintiff on the liability phase of the trial, and thereafter, the same jury returned to consider the damages aspect of the case. Upon conclusion of the proofs on damages, the jury returned a verdict of Two Hundred Thirty-Five Thousand Dollars ($235,000). From special interrogatories propounded to the jury, it can be determined that Two Hundred Thousand Dollars ($200,000) of the verdict was to compensate Mr. Jamison's estate for his wrongful death which the jury found to have been caused by defendant and Thirty-Five Thousand Dollars ($35,000) was to compensate the estate for lost wages sustained between the time of the discharge and the time the jury determined he obtained comparable employment in Scranton, Pennsylvania, as a television newscaster.

Throughout the litigation defendant raised timely objections to a number of matters, including the evidentiary rulings, the decision to permit the wrongful death claim to stand as a matter of law on the facts presented by this case and the decision to submit the liability and, later, the damages issues to the jury.

Presently before the court is defendant's motion for judgment notwithstanding the verdict and, in the alternative, for a new trial. Defendant contends that, viewed in the light most favorable to the plaintiff, the evidence was insufficient to sustain the jury's verdict that defendant discriminated against plaintiff's decedent. Defendant further says that, even if the discrimination decision can withstand a motion for judg-

ment notwithstanding the verdict, the jury verdict on the wrongful death aspect of the case must be rejected because there was not an adequate showing of mental illness to support that portion of the verdict under the instructions given the jury. Finally, defendant argues that, in the event the court rejects its motion for judgment notwithstanding the verdict, a new trial should be ordered because of seriously prejudicial evidentiary rulings at trial. Plaintiff responds that the circumstantial evidence was sufficient to support the jury verdict, particularly in a discrimination case where the plaintiff often is forced to rely heavily on circumstantial evidence. Plaintiff further responds that the testimony of Dr. Tanay, the plaintiff's expert witness on the question of suicide, established the presence of a "depressive illness" and that this, in turn, entitled the jury to find for plaintiff on the wrongful death issue. Plaintiff contests defendant's view that evidence was improperly admitted and urges that a new trial is not proper in this case.

### Motion for Judgment Notwithstanding the Verdict

■ The verdict of the jury will stand unless, viewing the evidence in the light most favorable to the plaintiff, reasonable minds could not differ as to the conclusions to be drawn from the evidence. *Morelock v. NCR Corp.*, 586 F.2d 1096, 1103–05 & n.10 (6th Cir. 1978), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979); *see generally* 5A Moore's Federal Practice ¶ 50.-07[2] (1980).

■ It is true that the direct evidence of discrimination in this case was limited and that, to conclude as the jury did, it was necessary to reject the testimony of defendant's witnesses that race was not a determining factor in the decision to discharge Mr. Jamison. However, I cannot agree that the plaintiff's case is wholly lacking of proof and that the verdict rested solely on disbelief of the defendant's witnesses. The jury had before it considerable circumstantial evidence technically sufficient to permit a finding in plaintiff's favor. The testimony regarding the sequence of the discharge of Mr. Jamison and the hire of Mr. Neal

was not uniform and arguably supports the inference that Neal was hired before Jamison was terminated. Evidence that Mr. Neal did not meet the usual qualifications for the job similarly would allow the fact finder to conclude that the employer's reason for plaintiff's termination was pretextual. *See Texas Department of Community Affairs v. Burdine,* —— U.S. ——, ——, 101 S.Ct. 1089, 1096, 67 L.Ed.2d 207 (1981). The absence of documented criticism of Mr. Jamison's performance and the failure to follow defendant's own policy regarding discipline and discharge also can support the jury verdict if the inferences most favorable to plaintiff are drawn from the evidence. Further, the jury had before it extensive testimony regarding the affirmative action plan and other factors, such as past WJBK licensing problems arising from continuing public pressure for minority employment, which arguably relate to continuing effort to recruit minority persons, particularly in higher ranking positions. All this evidence related to a motive to discriminate against a white male.

This recital embodies only some of the circumstantial evidence available to the jury. The evidence, when viewed in the light most favorable to the plaintiff, requires that I reject defendant's contention that the verdict on the discrimination issue must be set aside on this motion for judgment notwithstanding the verdict. There is room for reasonable minds to differ. *See Morelock v. NCR Corp.*, 586 F.2d 1096 (6th Cir. 1978), *cert. denied* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

■ With respect to the wrongful death issue, however, I conclude that defendant's motion for judgment notwithstanding the verdict must be granted. The plaintiff's proofs failed to show that decedent's suicide was the product of a mental illness resulting in an irresistible impulse to commit suicide.

Before the commencement of the damages phase of this trial, the court was confronted with the defendant's motion for summary judgment or to dismiss on the wrongful death claim. After extensive re-

view of the cases, I concluded that the case should be permitted to proceed over defendant's objection that, as a matter of law, causation was lacking. In connection with that ruling, reference was made to the showing required to support a conclusion that the suicide was a result of the wrongful act against the decedent. In that context I embraced, for purposes of this case, the following formulation from *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28, 40 (1960):

> [W]here the negligent wrong only causes a mental condition in which the injured person is able to realize the nature of the act of suicide and has the power to control it if he so desires, the act then becomes an independent intervening force and the wrongdoer cannot be held liable for the death. On the other hand, if the negligent wrong causes mental illness which results in an uncontrollable impulse to commit suicide, then the wrongdoer may be held liable for the death. Some cases speak of "insanity," and of "delirium or frenzy," and take the view that if the decedent knew what he was doing, the suicide is an independent intervening cause. We think, in light of modern knowledge as to mental illness, that this view is too narrow. It should not make any difference that the decedent "knew what he was doing." If defendant is to avoid liability, the decedent's act must be voluntary, not in that sense but in the sense that he could, in spite of his mental illness, have decided against suicide and refrained from killing himself.

Thus, the jury in this case was instructed that to find for plaintiff they must conclude that Mr. Jamison suffered "a mental illness which led to an irresistible impulse in Mr. Jamison to commit suicide." Jury Instructions on Damages Phase of Trial, p. 28. *See* Prosser, Law of Torts § 44, at 280–81 (4th ed. 1971); *see generally Annotation: Civil Liability for Death by Suicide*, 11 A.L.R.2d 751, §§ 3–8 (1950 & Supp.) [hereinafter, *Liability for Death by Suicide*, 11 A.L.R.2d 751].

The caselaw reflects a struggle on the part of the courts to fashion a standard that will protect the tortfeasor from liability for a subsequent suicide that speculatively may be related to the tort. An historical overview of the cases reveals an early refusal to recognize suicide as a consequence of defendant's wrongful act, *e. g., Scheffer v. Railroad Co.*, 105 U.S. 249 (1881); *Salsedo v. Palmer*, 278 F. 92 (2d Cir. 1921), followed by a later acceptance of the cause of action tempered by the imposition of exacting requirements as a foundation for the claim. *E. g., Tate v. Canonica*, 5 Cal.Rptr. 28; *see generally Liability for Death by Suicide*, 11 A.L.R.2d 751.

· The theme uniting both views is a societal value in individual freedom and its counterpart, individual responsibility. While current understanding of mental illness has permitted the judicial recognition that suicide may be "involuntary," it is nonetheless true, that, short of a basis for a conclusion that the self destruction was an involuntary act produced by a mental illness in the nature of a psychosis, this society elects to promote individual accountability for such choices. The legal formulation must strike the balance between defendant's responsibility for the consequences of its acts and the consensual societal value that requires life-affirming conduct.

■ Thus, it is inevitable that the legal standard against which a defendant will be judged for its liability in connection with an action based on a suicide takes on special importance. In *Tate v. Canonica*, the court speaks of mental condition and mental illness. If the person commits suicide in response to a mental condition, as distinguished from a mental illness, a prior tortfeasor, perhaps in part responsible for that condition, will not be liable because the act of the deceased is viewed as an independent intervening cause. But if the act of the tortfeasor spawns a mental illness which in turn causes the suicide, then the causal chain is not broken and liability will attach. Plainly, the distinction is a fine one that may rest largely on the terminology preferred by a given psychologist or psychiatrist. But its importance cannot be minimized, for it is the only shield between a past tortfeasor and liability for suicide by

the victim, and further, it is the best means the law can devise to account for the important social values intertwined with this difficult issue.

Because of these concerns, it is essential that a full explanation of the claimed mental illness be offered to assist the trier of fact in resolution of the question of causation. The importance of exact testimony is heightened in a case where the circumstances make it clear, even to the lay observer, that there are very serious questions concerning the nature and severity of the deceased's mental condition or illness. With few exceptions, one who commits suicide is suffering some abnormal mental condition. Therefore, the explication of the difference between that condition and a mental illness and of the connection between the tort and the illness is indispensible to plaintiff's case.

In the instant case, plaintiff's expert, Dr. Emanuel Tanay, testified that Mr. Jamison suffered "a severe narcissistic blow" causing him to lapse into depression. From the materials before him, the doctor confidently identified "symptoms" of depression, explaining that depression is an illness that limits one's ability to deal with stress. He concluded that Mr. Jamison's suicide was the product of an irresistible impulse caused by his depression resulting, in turn, from his discharge. He further explained that the depression had followed Mr. Jamison through his various living and employment situations after his departure from WJBK.

Though it is fair to conclude from the testimony that Dr. Tanay concluded Mr. Jamison suffered a "depressive illness," that will not sustain the exacting burden imposed on plaintiff to show he was mentally ill as a result of the discharge. As alluded to already, the crucial distinction must be made between a mental condition and a mental illness. Underlying the distinction is the concern of the courts that the act of suicide be non-volitional in order that it not break the causal chain. The failure to establish a mental illness attributable to his discharge and to show conclusively that Mr. Jamison was suffering more than a mental condition of depression common to many persons who have not achieved important

goals is fatal to the plaintiff's wrongful death claim.

This, then, is a circumstance in which reasonable minds cannot differ. On the testimony presented, it was not possible to find that Mr. Jamison was suffering a mental illness which led to an irresistible impulse to commit suicide. Accordingly, the defendant's motion for judgment notwithstanding the verdict will be GRANTED with respect to the wrongful death claim.

■ Although not an issue preserved by the defendant in its motion for judgment notwithstanding the verdict, I also note that, upon further reflection, it is my opinion that, as a matter of law, the intervening circumstances in the instant case require the conclusion that permitting the jury to consider the question in the first place was incorrect. It is true that long lapses in time between commission of a wrong and a suicide by the victim do not necessarily break the causal chain. *See Exxon Corp. v. Brecheen*, 519 S.W.2d 170 (Ct.App.Tex.1975) (thirty-four months). However, in that situation, the deceased had been admitted to a psychiatric hospital and had not been able to function effectively from the date of the injury. 519 S.W.2d at 173–74. In contrast, in the case at bar, more than two years elapsed between the discharge and Mr. Jamison's suicide. In the intervening time, he held several other broadcasting jobs in different cities and suffered the breakup of his marriage and loss of regular companionship of his children. At no time during that period is there evidence that Mr. Jamison sought psychiatric help or was immobilized from performing his jobs. At Scranton, Pennsylvania, for example, he performed effectively for a time as a news anchor on the local television station.

■ While one may arguably attempt to spin a web connecting all the events in Mr. Jamison's life after his discharge to the effect the discharge had on him, the connecting strands are too thin to support a legal claim. Explanations for our personality traits and idiosyncrasies are often laid to different life experiences we have had. But the fact that a person's life experiences

have an indelible effect on future developments cannot be independently sufficient to carry the requirement of legal causation. In the instant case, for example, the experiences contributing to Mr. Jamison's decision to end his life clearly were multiple; only by speculation can they be tied directly to the discharge. More probably, his life was complicated by the discharge and, as things "snowballed," life became increasingly unbearable. Of course, plaintiff would contend that if the discharge were at the core of the snowball then the causal requirement is met. This reading of causation is untenable, however, because, as I have suggested, the interconnection between life experiences is virtually infinite; to permit liability to attach merely because one event triggered other experiences which combined to create an unbearable circumstance for Mr. Jamison would be to expand the concept of causation beyond manageable bounds.

The suicide cases, allowing recovery, reviewed in preparation of my earlier opinion denying summary judgment, uniformly involve cases in which there exists the possibility of finding a strong, direct link between the suicide and the wrongful act of the defendant. *E. g., Fuller v. Preis*, 363 N.Y.S.2d 568, 35 N.Y.2d 425, 322 N.E.2d 263 (Ct.App.1974) (seven-month lapse marked by repeated medical treatment for symptoms resulting from the wrongful act); *Zygmaniak v. Kawasaki Motors Corp., U.S.A.*, 131 N.J.Super. 403, 330 A.2d 56 (1974) (four-day lapse—suicide in direct response to serious injury); *Freyermuth v. Lutfy*, 382 N.E.2d 1059 (Mass.1978) (two-month lapse with direct connection between mental illness relapse, accident, and eventual suicide); *Exxon Corp. v. Brecheen*, 519 S.W.2d 170 (Ct.App.Tex.1975) (thirty-four-month lapse marked by continuing psychological instability immediately and directly related to injury); *cf. McMahon v. City of New York*, 16 Misc.2d 143, 141 N.Y.S.2d 190 (Sup. Court 1955) (six-month lapse, during which plaintiff returned to work, found to preclude wrongful death claim). Thus, even these cases, rejecting a strict rule that suicide is necessarily an intervening cause, do not stand for the proposition that a plaintiff, whose decedent committed suicide under circumstances like those presented at bar, can overcome the problem of causation. Where the injury and the eventual suicide are so far removed in time and circumstance, causation is lacking as a matter of law.

■ This conclusion is reached with awareness that I previously found a jury question existed under the liberal view of cause-in-fact taken in Michigan. *See Davis v. Thornton*, 384 Mich. 138, 145–50, 180 N.W.2d 11 (1970). In *Davis* the Michigan Supreme Court recognized that "of all the elements necessary to support recovery in a tort action, causation is the most susceptible to summary determination for it usually amounts to a logical connection of cause to effect." *Id.* 145, 180 N.W.2d 11. The court concluded, however, that both the determination of causation and of negligence should almost always be left to the jury, resolving the tension between the court's responsibility properly to formulate legal standards of causation and the function of the jury as the arbiter of social values, in favor of jury resolution wherever "reasonable men could differ on this point." *Id.* 146, 180 N.W.2d 11. While I embrace this formulation and the unwaivering jurisprudential commitment to the jury's role as the conscience of society, further careful reflection leads to the decision that the instant case falls in the narrow exception reserved for cases in which there can be no reasonable conclusion that a sufficient causal nexus exists. *See* Prosser, Law of Torts § 45 at 289 (4th ed. 1971). On the facts of this case, submission of the causation issue to the jury pretermitted the court's responsibility to determine whether defendant's conduct was the legal cause of Mr. Jamison's death and permitted a finding based on causation in the philosophical sense, "which includes every one of the great number of events without which any happening would not have occurred." 2 Restatement of Torts 2d § 431, comment a, at 429 (1965).

Although this conclusion would buttress the ruling that judgment notwithstanding the verdict should be entered if the defend-

ant had preserved this question, since the causation issue was not addressed in the defendant's motion, *see* Wright & Miller, 9 Federal Practice and Procedure § 2537, at 598 (1971), I grant the motion for judgment notwithstanding the verdict on the ground that the testimony of Dr. Tanay was insufficient, as a matter of law, to provide the requisite foundation for a finding of mental illness and consequent irresistible impulse and offer these observations regarding causation simply to clarify the record.

### Motion for New Trial

With respect to the defendant's motion for new trial, I note, initially, that the court should rule on it even as to that portion of the case on which a judgment notwithstanding the verdict has been granted. *See generally* 5A Moore's Federal Practice ¶ 50.13 (1980). Improper admission of evidence is a ground for new trial if prejudicial. 6A Moore's Federal Practice ¶ 59.08[2] at 59–104 (1979).

Defendant contends that the affirmative action documents and statistics were improperly admitted. Included in the scope of defendant's argument are the Equal Employment Opportunity (EEO) reports filed with the federal government, the internal documents generated in connection with the affirmative action program, and the material from the Carino deposition.

Rule 403 of the Federal Rules of Evidence affords the trial court discretion to exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Evidence that appeals to a jury's sympathies and connects a party to a "highly charged public issue" must be carefully evaluated under this test. 1 Weinstein's Evidence ¶ 403[03] at 403–16 to 403–17 (1980). Similarly, the court must assess proffered evidence to determine if it would lead to confusion for the jury. As summarized by Professor Weinstein, "Courts are reluctant to admit evidence which is seemingly plausible, persuasive, conclusive and significant if detailed rebuttal evidence or complicated judicial instructions would be required to demonstrate that the evidence

actually has little probative value." *Id.* ¶ 403[04] at 403–25 to 403–26.

In the instant case, evidence regarding the affirmative action program was admitted. The evidence included the station's affirmative action program, reports to the FCC on compliance (*e. g.*, Exh. 24, FCC Form 395), and internal memoranda prepared in connection with compilation of the reports on EEO compliance. These memoranda, prepared and testified about by Mr. Larry Carino, included reference to a practice of holding open a job for a qualified black person (Exh. 35) and, in one instance, named the person hired for such a position (James Proctor, *see* Carino deposition at 30–31).

As is explained in the following Rule 403 analysis, serious questions arise under that rule with respect to the general admissibility of affirmative action materials. I conclude, on the facts of the case at bar, that Rule 403 does not require exclusion of the evidence challenged by defendant. However, under a privilege concept that will be discussed following the Rule 403 analysis, I conclude that certain crucial evidence relating to affirmative action efforts should have been excluded.

There can be no dispute that affirmative action and the issue of so-called "reverse discrimination" evoke strong emotions in many persons. Recent Supreme Court decisions, *e. g.*, *Steelworkers v. Weber*, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979); *Regents v. Bakke*, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), have received very extensive media coverage in which the merits and demerits of affirmative action have been widely debated. Moreover, in the present time of economic recession, the tensions attendant to affirmative action issues are exacerbated by the layoff decisions and related questions about whether to adjust strict seniority schemes to account for persons recently hired through affirmative action. In short, invocation of the term "affirmative action" and specific reference to corporate actions in furtherance of affirmative action policies stir strong feelings of resentment in many persons, to the prej-

udice of a corporation attempting to defend action taken with respect to a white male.

On the other hand, the existence of an affirmative action program has minimal probative force in a case involving a claim of individual discrimination. At best, a proponent of admissibility may claim that the existence of a plan is an acknowledgement that race may be a factor in an employment decision or that an inference is permitted that the employer has a motive to discriminate. Either contention logically advances the claim of discrimination in a discrete act of hiring or discharge only marginally while simultaneously creating great potential for prejudice.

General admissibility of affirmative action material also has a high potential for misleading and confusing the fact finder. Faced with such evidence, a defendant is in the position of having not only to defend the discrete action taken against the plaintiff but also of having to defend, collaterally, the bonafides of the affirmative action plan, even though they are not directly attacked by the plaintiff and have no necessary logical connection to discrete acts of discrimination. Absent a significant connection between the action taken against plaintiff and the presence of an affirmative action plan, exploration at trial of affirmative action policies must be carefully limited to protect the defendant from marginal inferences the jury might draw. The existence of an affirmative action program and activity in support of it by the employer is not sufficient to support an inference of intentional discrimination in a particular instance.

I do not conclude in the instant case that the bare statistics, drawn from the Equal Employment Opportunity Commission/Federal Communications Commission reports, cannot be used. Nor do I conclude that the affirmative action plan itself should have been excluded under Rule 403. The plan was distributed to the general public and, specifically, to a black interest group that was challenging the sufficiency of WJBK's efforts to recruit and program for minorities. In this circumstance the affirmative action program was used by the corporation outside its dealings with governmental administrative agencies. The pressure from interest groups regarding programming and personnel practices on several occasions before Mr. Jamison's discharge arguably provided the station with a motive to discriminate. To the extent that the station, as a matter of business judgment and public relations, responded to the complaint by reference to its affirmative action program and other policies aimed at meeting concerns of the black community, see trial Exh. 29, the material offered cannot fairly be claimed to be unduly prejudicial or confusing when offered by the plaintiff at this trial. In short, the defendant's voluntary public use of the plan in this context provided a connecting link between the plan and a motive to discriminate against plaintiff's decedent. The material is relevant and leaves room for the reasonable inference that an ongoing effort to integrate the staff is being pursued in response to community pressure. E. g., Exh. 29 at p. 12. Thus, the affirmative action program material disclosed to the public was admissible, as were the statistics that could be gleaned from the affirmative action reports.

Different considerations obtain with respect to evidence of discrete acts, disclosed in internal memoranda prepared in connection with EEO reporting obligations. In particular, the jury was told about alleged decisions by the defendant to hold open a vacancy to secure a black applicant. Specific reference to a newsreel cameraman job was made in a memorandum testified about by Mr. Larry Carino, and evidence of a practice of holding open positions is referred to in Exhibit 35, testified to by Mr. Carino in his deposition at pages 28 and 29. These documents and testimony regarding them involve confidential internal decisions taken in connection with the station's affirmative action policy. They are removed in time by at least four years from the date of Mr. Jamison's discharge, and admission of them requires the defendant to attempt collaterally to defend the alleged practice. Both danger of prejudice and potential for confusion of the jury are considerable.

1296

However, under the most exacting standards of logical relevancy, this evidence does lay a basis for drawing an inference that the defendant not only wanted to hire blacks but would use unlawful means to do so, an inference which is probative of plaintiff's claim. Balancing these considerations, I do not conclude that Rule 403 required exclusion of this evidence.

In sum, I do not conclude that Rule 403 compels exclusion of the affirmative action related evidence offered by plaintiff and admitted in the trial. With respect to the general affirmative action material and statistics gleaned from it, the conclusion hinges on the volitional business use made of the material by the defendant in connection with past dealings with interest groups in the community. With respect to specific incidents identified in the Carino materials, I conclude that the evidence is sufficiently probative to overcome the identified prejudice created by the evidence.

However, consideration of the specific incidents identified in the Carino testimony and exhibits under an alternative analysis advanced by defendant compels the conclusion that this evidence was erroneously admitted. The affirmative action materials were initially prepared in compliance with the mandates of the FCC, which require stations to "establish, maintain, and carry out, a positive continuing program of specific practices designed to assure equal opportunity in every aspect of station employment policy and practice." 47 C.F.R. § 73.-2080(b) (1979).

The same policy concerns are embodied in regulations promulgated by the Department of Labor regarding affirmative action under Title VII. The Regulations provide: "It is essential to the effective implementation of Title VII that those who take appropriate voluntary affirmative action receive adequate protection against claims that their efforts constitute discrimination." 44 Fed.Reg. No. 14, p. 4422 (January 19, 1979). The regulations go on to formulate guidelines which, if followed, will insulate an affirmative action plan from attack as discriminatory.

In the discovery context, it has been recognized that affirmative action plans and subjective data compiled by the employer in compliance with affirmative action requirements should not be subject to disclosure in a discrimination action. *Dickerson v. United States Steel Corp.*, 14 F.E.P. 1448 (E.D.Pa.1976); *Sanday v. Carnegie-Mellon University*, 12 F.E.P. 101 (W.D.Pa.1975); *see Roberts v. National Detroit Corp.*, 87 F.R.D. 30 (E.D.Mich.1980) (Newblatt, J.). In *Dickerson* the plaintiff sought disclosure of affirmative action materials, but the defendant objected, interposing policy arguments against disclosure. Agreeing with the defendant, the court said, "[T]he defendant's public policy argument does apply to affirmative action and consent decree materials that contain [defendant's] proposed goals and timetables or evaluations of its progress. Disclosure of such subjective information could discourage employers from making the candid internal evaluations that the affirmative action program envisions." 14 F.E.P. at 1449; *accord, Banks v. Lockheed-Georgia Co.*, 53 F.R.D. 283, 285 (N.D.Ga.1971). The policy concern expressed is in keeping with the explicit rejection by the drafters of the Elliot-Larsen Civil Rights Act, M.C.L.A. § 37.1101 *et seq.*, of any contention that the Act could be read to restrict implementation of affirmative action programs. *See* M.C.L.A. § 37.2705(2). Thus, utilization of the Act in litigation to force disclosure of affirmative action data to the trier of fact in an effort to establish discrimination is contrary to the statutory intent since such use would undermine efforts to implement affirmative action programs. This is especially so in view of the high prejudicial impact that reference to affirmative action programs can have. Thus, the discussion of prejudice in the Rule 403 context is properly recalled here, when evaluating the policy concerns related to use of affirmative action material in litigation.

This is not to suggest that the objective statistics embodied in the affirmative action report and memoranda cannot be used on retrial by plaintiff. Rather, what is recognized here is a privilege

against use of the subjective affirmative action data, prepared in compliance with federal mandate. The court need not reach the privilege questions raised by use of the plan and the statistics since, assuming *arguendo* the existence of a privilege, the defendant has disseminated the affirmative action plan itself in response to public pressure regarding minority hiring. The business is a highly visible one generating considerable community response to its activities. In such circumstances, it must be concluded that defendant has waived any privilege to withhold information the business has already publicly disclosed voluntarily in the exercise of sound business judgment about how to diffuse protest aimed at the company. Thus, under a privilege analysis, the general affirmative action materials were properly admitted, as were the statistics that could be gleaned from the administrative reports.

The Carino memoranda and testimony, however, tie in with the EEO reporting procedures and speak to matters never disclosed in response to community pressure. That evidence is a prime example of the "candid internal evaluation" that would be deterred by a general rule of admissibility. *Dickerson v. United States Steel Corp.*, 14 F.E.P. at 1449. Under the privilege concept formulated, the Carino materials should have been excluded. The station's response to public pressure in no way opened the door to these pieces of "candid internal evaluation" which clearly relate directly to efforts to meet EEOC demands.

I acknowledge that the privilege concept is not a fully developed idea and, as with privileges generally, shares the drawback of any *per se* rule that restricts the fact finder's access to probative evidence. The conclusion that an exception, waiver, occurred with respect to those materials disseminated by the defendant is an attempt to meet some of the concerns created by application of a rigid privilege.

Finally, I cannot conclude that admission of the evidence presented in the Carino testimony and through the Carino exhibits was harmless to the defendant. As alluded to in connection with the Rule 403 discussion, above, the evidence supports an inference that Mr. Jamison was discharged precisely because the station needed to hire a black and was not above taking improper steps to achieve that end. It was, in my view, the most damaging evidence offered by plaintiff. Other evidence offered by plaintiff was not sufficient to render the Carino material surplusage, thereby justifying the jury verdict for plaintiff in the absence of that very damaging evidence.

Accordingly, I cannot conclude that admission of the Carino testimony and exhibits was harmless error; justice requires that defendant be afforded another opportunity to defend without the prejudice of this improper evidence. As an administrative matter, it should also be noted that, in the event the ruling on defendant's motion for judgment notwithstanding the verdict is vacated or reversed, a new trial on the wrongful death issue would be granted for the reason that the wrongful death verdict hinges on the finding of discrimination and the facts underlying that finding.

For the reasons set forth, defendant's motion for judgment notwithstanding the verdict on the wrongful death claim is GRANTED; the motion is otherwise DENIED (insofar as it goes to the entire case, including the discrimination claim). Defendant's motion for new trial is GRANTED on the basis that the evidence admitted through Mr. Larry Carino together with portions of his deposition should have been excluded on the basis of a privilege attendant to affirmative action materials prepared in response to governmental requirements.

As a final matter, I note that I reserved final ruling during trial on that portion of defendant's motion for summary judgment in which it was contended that Michigan Workers' Compensation provides the exclusive remedy for Mr. Jamison's emotional suffering and death. The parties were requested to submit supplemental briefs on the issue whether injury suffered as a consequence of discharge and not manifesting itself during the tenure of employment arises "out of or in the course of employment" so as to be compensable under the statute. The parties were further request-

ed to consider the issue whether the court could and should certify the issue of coverage of Mr. Jamison's injury to the Michigan Workers' Compensation Board.

Plaintiff filed an extensive and carefully prepared brief addressing the workers' compensation issue and attendant questions of abstention. Defendant filed nothing further and elected to rest on the briefs submitted at trial.

■ I remain unconvinced that the injury complained of here falls within the scope of the Workers' Compensation statute. Defendant has supplied no case in which coverage was extended to someone who was discharged and thereafter suffered injury but who had manifested no emotional or other injury prior to the discharge. Furthermore, without further guidance from the defendant, I decline independently to explore the possibility of certifying the question to the Workers' Compensation Board both because the certification process is by no means clear and because the court is empowered to interpret the statute. In my judgment, the statute does not cover the alleged discharge related injury here experienced.

Accordingly, the reserved portion of the motion for summary judgment based on the Michigan Workers' Compensation statute is hereby DENIED.

IT IS SO ORDERED.