**Michelle SHAMBURGER, Individually and as Representative Heir of James A. Shamburger, as Administratrix of the Estate of James A. Shamburger and as the Next Friend and Natural Guardian of Jessica Tootle, A Minor, Plaintiff,**

v.

**GRAND CASINO OF MISSISSIPPI, INC./BILOXI, a Minnesota Corporation, Grand Casinos of Mississippi, Inc./Gulfport, A Minnesota Corporation, Grand Casinos Resorts, Inc., a Minnesota Corporation, Grand Casinos Incorporated, a Minnesota Corporation, ABC Corporations 1 through 4 and John Does 1–7, Defendants.**

No. 1:97CV46RG.

United States District Court,
S.D. Mississippi,
Southern Division.

Aug. 5, 1998.

John Booth Farese, Farese, Farese & Farese, Ashland, MS, Mark S. Larson, Mack A. Bethea, Michael B. Holleman, Gulfport, MS, for Plaintiff.

Allan P. Bennett, Ricky G. Luke, Watkins, Ludlam, Winter & Stennis, Jackson, MS, for Defendant.

## MEMORANDUM ORDER

DAN M. RUSSELL, Jr., District Judge.

This cause is before this Court on Motion of the Defendants, Grand Casino of Mississippi, Inc., *et al.* (Docket No. 53–1) for Summary Judgment [the Defendants will be collectively referred to herein as "Grand"]. The Court has reviewed the record, as well as the Motion for Summary Judgment and the memoranda and exhibits submitted by both the moving defendants and nonmoving Party Plaintiff, Michelle Shamburger, and finds as set forth herein.

### I. UNCONTROVERTED FINDINGS OF FACT

On May 7, 1996, James Shamburger [hereinafter "Shamburger"] committed sui-

cide in his Apartment in Slidell, Louisiana. The plaintiff, Shamburger's widow, Michelle, contends that Grand Casinos, Inc., and affiliated companies are legally responsible for Shamburger's suicide.

The testimony *inter alia* of certain family members, work associates, and his previous doctor, submitted by the Grand in its motion for Summary Judgment reflects that Shamburger married two times, has two natural children, and had trouble with gambling and drinking and relationships. (Exhibit 1 to Def. Grand's Motion for Summary Judgment, Depo. Of Shamburger's mother, Alcie Armstrong). He married the plaintiff Michelle in 1987. (*Id.* at p. 20).

James and Michelle purchased an existing optical business in New Orleans, "Sterling" a/k/a J & M Optical. (See Exhibit 7, Michelle Shamburger Depo, at 13; Exhibit 8, Michelle Shamburger Depo., Vol. II, at 40). After a time, the business began to have financial difficulty, and by the summer of 1994, the business had failed and Shamburger found himself liable for its debts. (*Id.*, p. 25, p. 104). Trade creditors of Sterling were demanding payment from Shamburger and threatening him with litigation, garnishment and seizure of his property. See Exhibit 8, Michelle Shamburger Depo., Vol. II at 101–09. Still, Shamburger continued to gamble. In July of 1994, after Sterling had gone out of business, he gambled at the Grand casinos on several occasions, writing markers in amounts totaling three thousand dollars ($3,000) in order to obtain chips with which to gamble. When the markers were presented for payment at Hibernia National Bank they were returned to Grand stamped "ACCOUNT CLOSED." (See Exhibit 19). When Shamburger, despite several written and telephonic requests from Grand, failed to make any effort to make the instruments good, they were turned over to the Office of the District Attorney for Harrison County, Mississippi ("the District Attorney") pursuant to Miss. Code Ann. Section 97–19–55 *et seq.* ("the Mississippi Bad Check Statutory Scheme"); (see Exhibit 20). Specifically,

in December of 1994 and January of 1995, Shamburger received letters in the statutorily prescribed form from the office of the District Attorney with respect to each of the instruments in question. (Exhibit 20; Exhibit 7, at 124–125) In response to these letters, Shamburger made no effort to pay or to discuss payment of the $3,000 he owed to Grand. Instead, on January 19, 1995, in the company of and apparently upon the advice of his attorney Mack Bethea, he appeared at the Office of the District Attorney and presented himself for arrest; a note prepared by a member of Mr. Bethea's staff records the event in the following words: "Mr. Shamburger and Mr. Bethea went to the DA's office and attempted to turn Mr. Shamburger in on a bad check charge. No one would arrest him." Ex. 21; see also Exhibit 3. Shamburger never received another communication from either Grand or the District Attorney with respect to the $3,000 debt after this trip to the Office of the District Attorney on January 19, 1995. Thereafter, Shamburger was never indicted, arrested, or subjected to criminal prosecution in connection with the $3,000 he owed to Grand for the dishonored instruments he wrote.

In March 19, 1995, Shamburger and Michelle filed a joint petition in bankruptcy. (See Exhibit 3, depo. of Bethea). The $3,000 Shamburger owed to Grand was listed on the schedule of unsecured debts. The unfunded joint liabilities of Shamburger and Michelle exceeded $220,000. The debt to Grand thus constituted less than 1.5 percent of this total. (*Id.*). Thereafter, the Shamburgers lost their home in Diamondhead, Mississippi, and moved to an apartment in Slidell, Louisiana, where he thereafter committed suicide. (Exhibit 8, Depo. of Michelle Shamburger).

Some observers state that the loss of the family business appeared to be a decisive blow from which Shamburger never recovered. Michelle's brother testified that Shamburger never appeared to him to be the same after the failure of the business

and that he became apathetic and withdrawn. (Exhibit 5, Roderick Readeau at 41). Michelle Shamburger told the investigating officer at the suicide scene that Shamburger had been depressed for two years since the failure of Sterling; She also made a substantially identical statement to the treating physician in the emergency room. After the failure of the business, Shamburger never worked for a sustained period at any one job and never again attained a level of income even approaching that which he had enjoyed prior to the collapse of Sterling. His drinking increased, as did his abusiveness toward his family. In December of 1994, he was arrested for and subsequently found guilty of "disturbance of family." Exhibit 12.

Shamburger also had several encounters with law enforcement after the failure of the family business, none of them related in any manner to the $3, 000 he owed to Grand. In addition, he was arrested in February of 1995 for reckless driving, DWI, and disorderly conduct and found guilty of the last offense. In August of 1995, he was charged with "false pretense" for writing a bad check to a merchant, in Hancock County, Mississippi. The court date for this charge was April 16, 1996, only a few weeks before his-suicide. He entered a plea of guilty, made restitution, and, significantly for the purposes of the instant motion, served no jail time. Ex. 12.

Other witnesses testify that Shamburger did not appear to be in the throes of deep depression, but appeared instead to be fully functional and in control of his faculties. *See* Exhibit 10, Rhonda Shamburger, at 34–36; Hayden at 24–25. *See* Exhibit 4, Bill Ogden, at 38. (Shamburger's direct supervisor from November of 1994–June of 1995).

## II. CONCLUSIONS OF LAW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-

tled to a judgment as a matter of law." Rule 56 F.R.Civ.P. In *St. Amant v. Benoit,* 806 F.2d 1294, 1296–97 (5th Cir.1987), the Fifth Circuit addressed the law as regards summary judgment and stated that "[t]he mere existence of a factual dispute does not by itself preclude the granting of summary judgment. '[T]he requirement is that there be no *genuine* issue of *material* fact.' *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original)." (citations omitted).

The Fifth Circuit has addressed when an issue is genuine.

[A]n issue is genuine if the evidence supporting its resolution in favor of the party opposing summary judgment, together with any inferences in such party's favor that the evidence allows, would be sufficient to support a verdict in favor of that party. If, on the other hand, the evidence offered by both the moving and opposing parties would support only one conclusion and, even if all the evidence to the contrary is fully credited, a trial court would be obliged to direct a verdict in favor of the moving party, the issue is not genuine.

*Professional Managers, Inc. v. Fawer, Brian, Hardy & Zatzkis,* 799 F.2d 218, 222 (5th Cir.1986) (footnotes omitted).

The United States Supreme Court further stated in *Liberty Lobby* that as to materiality, "[o]nly disputes over the facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505. *See Celotex Corporation v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Barebones allegations are insufficient to withstand summary judgment because the opposing party 'must counter factual allegations by the moving party with specific, factual disputes; mere general allegations are not a sufficient response.' " *Howard v. Greenwood,* 783 F.2d

1311, 1315 (5th Cir.1986) (citing *Nicholas Acoustics & Specialty Co. v. H & M Construction Co., Inc.*, 695 F.2d 839, 845 (5th Cir.1983)). The nonmoving party "must set forth specific facts showing the existence of a genuine issue concerning every essential component of its case." *Morris v. Covan Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir.1998).

### A. Suicide is a superseding Cause precluding Liability

█ Each of the numerous claims asserted by the Plaintiffs in the instant case is ultimately predicated upon the suicide of Shamburger. The fundamental contention is that Grand somehow caused the suicide and is therefore liable not only for the suicide itself, but also for a limitless range of purported injuries claimed to originate in the suicide. The Grand submits that "suicide" has always been recognized to constitute an independent, intervening and superseding event that severs the causal nexus between any wrongful action on the part of the defendant. Suicide is still legally recognized as a common law crime in Mississippi. *See Nicholson on Behalf of Gollott v. State*, 672 So.2d 744, 753 (Miss. 1996).

The Fifth Circuit summarized the American rule regarding suicide in the following language:

> ["U]nder the American rule where the resulting insanity following an injury is such as to cause suicide through a *voluntary willful choice* determined by a moderately intelligent mental power which knows the purpose and physical effect of the suicidal act, even though the choice is dominated by a disordered mind, there is a new and independent agency which breaks the chain of causation arising from the injury, and *no compensation* can be had."

*Voris v. Texas Emp Ins. Assn.*, 190 F.2d 929, 932–33 (5th Cir.1951) (emphasis added), *cert. denied*, 342 U.S. 932, 72 S.Ct. 376, 96 L.Ed. 694 (1952).

### B. The Legal test in Mississippi

█ Mississippi is one jurisdiction wherein, relatively recently, certain jurisdictions have recognized an exception to the common law rule, and have allowed recovery for intentional conduct resulting in suicide where the tortious conduct produces "a mental illness resulting in an irresistible impulse to commit suicide." *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286, 1291 (E.D.Mich.1981), *aff'd in part, reversed in part on other grounds*, 830 F.2d 194 (1987).

The Mississippi Supreme Court recognized the Irresistible Impulse Doctrine in the seminal case of *State for Use and Benefit Richardson v. Edgeworth*, 214 So.2d 579 (Miss.1968). In *Edgeworth*, the court was faced with the task of determining whether to allow recovery for wrongful death upon the suicide of the decedent. *Edgeworth*, 214 So.2d at 587, citing the California case of *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (1960) (in which the Irresistible Impulse Doctrine was first articulated), held that, "where the suicide is committed in response to an uncontrollable impulse, recovery may be had if the mental state of [the] deceased was substantially caused by the defendant's intentional wrongful acts ...".

Mississippi now apparently permits recovery if, at the time of suicide, the decedent was acting under an irresistible impulse proximately caused by the intentional wrongful conduct of the defendant. Accordingly, even if this Court were to determine that there is a factual issue regarding the alleged wrongfulness of Grand's actions, the suicide would preclude recovery as a matter of law unless the plaintiff can establish that Shamburger was acting under an irresistible impulse proximately caused by the Grand's alleged tortious conduct.

*Edgeworth* remains the sole articulation in Mississippi. The *Edgeworth* Court quoted the following language defining the Irresistible Impulse Doctrine: ... It was an issue of fact as to whether at the time

the employee took his life he was suffering "from a mental disturbance of depressive insanity and did not have the mental capacity to determine the consequences of his act. If he took his own life through an uncontrollable impulse and without conscious volition to cause death, and the mental condition was caused by the injury, the death was compensable". *Id.* at 587.

■ Thus, under Mississippi law it is essential, *inter alia,* that the decedent must have been in a state of "mental disturbance" in order to be deemed as acting under an irresistible impulse. In addition, he must not be in control of his faculties, or be able to discern the nature nor understand the consequences of his own actions in taking his life. Moreover, the act must be "without conscious volition," a requirement which further emphasizes the extreme severity of the mental state which must exist in the decedent in order to establish the presence of an irresistible impulse. Finally, the impulse must in fact be proximately caused by the wrongful conduct of the defendant.

In *Jamison,* the court granted the defendant's motion for judgment notwithstanding the verdict on the issue of wrongful death because the plaintiff's proof failed to establish that the decedent was acting under an irresistible impulse. *Id.* The court opined that:

> If the person commits suicide in response to a mental condition, as distinguished from a mental illness, a prior tortfeasor, perhaps in part responsible for that condition, will not be liable because the act of the deceased is viewed as an independent intervening cause. But if the act of the tortfeasor spawns a mental illness which in turn causes the suicide, then the causal chain is not broken and liability will attach. Plainly, the distinction is a fine one that may rest largely on the terminology preferred by a given psychologist or psychiatrist. But its importance cannot be minimized, for it is the only shield between a past tortfeasor and liability for suicide by the victim, and further, it is the best means

the law can devise to account for the important social values intertwined with this difficult issue.

*Id.* at 1291.

■ Accordingly, the legally dispositive distinction to be made by the Court is that between a mental "condition", such as depression, and a mental "illness". Actions caused by a mere mental condition are deemed volitional and therefore sever the causal chain linking suicide to wrongful conduct.

If the factfinder could only come to one reasonable conclusion, i.e., that the acts of Shamburger are *voluntary,* then they are *not* actionable because the causal chain is broken and this Court should grant summary judgment. One must have a "mental illness" to produce an irresistible impulse; acts caused by a "mental condition" are deemed voluntary and not actionable as a matter of law.

■ The moving party Grand has demonstrated to this Court that it is entitled to summary judgment by pointing out the absence of evidence necessary to support the plaintiff's case. *Morris v. Covan Wide Moving, Inc.,* 144 F.3d 377, 380 (5th Cir. 1998). The evidence that the plaintiff has not produced is testimony from an appropriate expert that reflects an opinion that James Shamburgers's actions were those resulting from of an irresistible impulse. The testimony of the Plaintiffs' expert, Dr. Roy James Barnes, a board certified psychiatrist, establishes that Shamburger was not acting under an irresistible impulse when he committed suicide. Exhibit 2 to Defendants' Motion to Dismiss. Reduced to its essence, the Court finds that Dr. Barnes' testimony reflects that Shamburger killed himself of his own volition, and knew and fully understood the consequences of his actions. Yet, the plaintiff argues that Dr. Barnes testified to the contrary, *i.e.,* that Shamburger's problems and the Grand debt he owed with the fear of going to jail caused Mr. Shamburger to not be able to resist the impulse to commit

suicide. Dr. Barnes stated that although he never interviewed Mr. Shamburger himself (*Id.* at 60), that from the information he had at the time he formulated his opinion, that the primary cause of Shamburger's suicide was his fear of going to jail and that the legal term, not a medical term that he knew of, "irresistible impulse" would be applied if a suicide had resulted. (*Id.* at 64–65). Dr. Barnes stated that he understood the term to mean that someone's conduct is out of control due to an external force and that the impulse displaced the ordinary judgment of the actor (Id. .), and his "understanding of what's going on" (*Id.* at 66–67); he further stated that the threat of going to jail caused an irresistible impulse to arise in Mr. Shamburger due to mental *stress* (*Id.* at p. 62), but that ultimately his acts when he committed suicide were volitional. Clearly, for the Court's purposes here, Dr. Barnes stated that if you had asked Shamburger what he was going to do before he committed suicide, he would have said he was going to kill himself and such acts were voluntary and with knowledge of the consequences of his acts. (*Id.* at pp. 81–82). "Stress" is indicative of a mental condition and not a mental illness which the case law as set forth herein has required for an actor to not be able to resist the impulse to commit suicide. Dr. Barnes also testified that besides Shamburger's problems with the Grand debt, he had a multitude of financial and personal problems going on for years in his life, not just those involving the Grand and his last contact with the Grand in January of 1995. (*Id.* at pp. 65–105). He also stated that he assumed in his opinion that Mr. Shamburger believed that he was going to jail whether he paid the debt owed to the Grand or not, and that if that assumption was incorrect he would have revised his opinion. (*Id.* at 103). The facts also reflect that Shamburger had ways to pay the $3,000 owed to Grand such as from his mother. (See Exhibit 1 to Def. Grand's Motion for Summary Judgment, Depo. Of Shamburger's mother, Alcie Armstrong).

### C. There Is No Credible Evidence of an Agreement to Hold the Instruments in Question.

The gravamen of the Plaintiffs' claim in this case is that an agreement to hold an instrument in the form of a check converts that instrument into a debt instrument, making it no longer a proper subject for criminal prosecution under the Mississippi Bad Check Statutory Scheme. Thus, the Plaintiffs argue, if there was an agreement to hold the instruments in question, it was tortious for Grand to file a complaint with the District Attorney under the Mississippi Bad Check Statutory Scheme when those instruments were dishonored by the bank on which they were drawn. It is upon this premise that all the Plaintiffs' claims are predicated. Even if the legal position of the Plaintiffs is assumed *arguendo* to be true, nonetheless the crucial factual predicate for the claim is proof that there was an agreement to hold the instruments in question. The Plaintiffs, however, are unable to adduce any credible evidence of the existence of such an agreement. Indeed, to the contrary, when Shamburger first obtained the right to write checks/markers at Grand, he executed an agreement containing these terms: "Any markers not picked up on departure will be deposited to your bank unless prior arrangements are made with the shift manager, table games manager, VP of casino or slot manager." Exhibit 22. These terms, acknowledged by Shamburger in writing, establish not an agreement to hold the markers but, to the contrary, an unambiguous statement that the markers will not be held but will be deposited at the bank upon which they are drawn upon departure. Neither the widow, Mack Bethea, the previous attorney for James Shamburger, or the Grand, have anything evidencing such an agreement.

### D. The Attorney General Opinion in issue

The law with respect to the plaintiff's proposition—that an agreement to hold a marker, without more, is sufficient to pre-

clude the treatment of the marker as a check for purposes of the Mississippi Bad Check statutory scheme is insufficiently settled by the law or any Attorney General Opinion in order to establish a legal duty on the part of the Grand.

E. *The Conduct of Grand as Alleged in the Complaint Does Not Rise to the Level Necessary to Meet the Legal Standard for Intentional Infliction of Emotional Distress.*

■ In order to state a claim for intentional infliction of emotional distress under Mississippi law, a plaintiff must, *inter alia,* allege conduct which is extraordinary and outrageous. *See* Restatement (Second) of Torts. 813 F.Supp. at 446; *accord White v. Walker,* 950 F.2d 972, 978 (5th Cir.1991); *Glasgow v. Sherwin–Williams Co.,* 901 F.Supp. 1185, 1191 (N.D.Miss.1995). Specifically, the courts have focused on comment d to Section 46 of the Restatement. Comment d provides in relevant part as follows:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice", or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . .

■ There is no evidence that a reasonable fact finder would find the actions of the Grand constituted such conduct towards Shamburger himself, especially in light of the time frame from the day he went into the District Attorney's office on January 19, 1995, regarding the markers, and then no action occurred relative to the Grand debt, by the Grand, thereafter. As regards Michelle and her daughter's claims for intentional infliction, the claims are too remote in light of *Greene v. Roy,* 604 So.2d 1359, 1364 (Ct.App.La.), *cert. denied,* 607 So.2d 544 (1992).

F. *The plaintiff's conspiracy claim*

The plaintiff's conspiracy claim fails as a matter of law as alleged because the Grand could not conspire with itself. *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984).

G. *The Fair Debt Collection Practices Act*

■ The Fair Debt Collection Practices Act does not apply to the actions of a party seeking to collect a debt owed to itself. Such a party is not within the scope of the definition of the term "debt collector" as defined by Congress in § 1692(a) of the Act. In addition, a corporate affiliate or subsidiary who collects a debt owed to its parent or affiliate is likewise excluded from the definition of "debt collector". *See Meads v. Citicorp. Credit Services, Inc.,* 686 F.Supp. 330 (S.D.Ga.1988).

H. *Instruments written on Closed Accounts are intrinsically fraudulent*

■ Under Mississippi law, generally, a fraudulent misrepresentation must relate to a presently existing condition. Statements regarding future events, that is, conditions not presently in existence, normally cannot form the basis for a fraud claim. Writing a bad check is, under Mississippi law, generally considered a fraudulent act since the check is deemed to be a representation as to the then existing condition of the balance in the drawer's account and, the dishonoring of the check on the grounds of insufficient funds is deemed to be evidence that the drawer's representation as to the existing status of this account at the time of the writing of the check was false. If a check is post-dated, however, some, although not all, jurisdictions consider the instrument no longer to be a representation regarding an existing fact. Accordingly, some jurisdictions, although not all, will not permit prosecution under their bad check statutory schemes for an NSF check which is post-dated. It is the Plaintiffs' apparent contention that

an agreement to hold a marker for any period of time converts the marker into a species of "post-dated" check. Thus, under the Plaintiffs' analysis, the instrument even if dishonored would not be subject to prosecution, under the Mississippi Bad Check Statutory Scheme.

In the instant case, however, the instruments in question were dishonored according to the stamp placed on the instruments by the bank, not because the accounts contained insufficient funds to pay the instruments, but because the accounts were closed. (Each marker when presented for payment at the Hibernia National Bank was returned to Grand stamped "ACCOUNT CLOSED." Although two of the markers were drawn on an account which was closed, the status of the account on which the third marker was drawn is uncertain. That fact is, however, immaterial to the instant argument). Writing a negotiable instrument on an account which is closed is fundamentally different from writing a check where there are insufficient funds.

### I. Suicide cannot Form the Basis for a Wrongful Death Recovery under Mississippi Law.

The Grand submits that if a claim could not have been brought by the decedent had he survived, it cannot be asserted under the statute by the wrongful death claimants. It is the opinion of the Court that Mr. Shamburger's acts were volitional at the time of his suicide and the plaintiff's tort claims, including those brought pursuant to the Mississippi Wrongful Death statute, are barred.

### J. The Plaintiffs Cannot Establish the Essential Elements of a Claim for Abuse of Process.

The Plaintiffs assert claims both for abuse of process and for malicious prosecution. The Mississippi Supreme Court has distinguished these two species of tort claims in the following instructive manner:

 An action for abuse of process differs from an action for malicious prose-

cution in that the latter is concerned with *maliciously* causing process *to issue*, while the former is concerned with *the improper use of process after it has been issued.* *Moon v. Condere Corp., 690 So.2d 1191, 1197* (Miss.*1997*) Thus, the essential first element of a claim for abuse of process is proof that process either criminal or civil, was ever issued by any court as to Shamburger or anyone else in connection with the $3,000 he owed to Grand. *See* Michelle Shamburger, Vol. I at 49–50; Bethea at 41–43. Since no process was ever issued, obviously there can have been no abuse of process. The abuse of process claim must be dismissed with prejudice.

### K. The Plaintiffs Cannot Establish the Essential Elements of Malicious Prosecution.

 The Plaintiffs assert a claim for malicious prosecution. Again, a claim for malicious prosecution is founded upon "improper use of process after it has been issued." 690 So.2d at 1197. Of course, if no process has been issued, as the undisputed evidentiary record reveals, there can be no malicious prosecution. As a matter of definition, a plaintiff asserting a claim for malicious prosecution must be able to establish, *inter alia*, "the institution of a criminal proceeding." Under Mississippi law, "Criminal proceedings are instituted when a person is formally arrested and charged with an offense." City of *Mound Bayou v. Johnson*, 562 So.2d 1212, 1219 (Miss.1990). It is undisputed that Shamburger was never arrested. Mr. Bethea, his attorney in the matter, testified as follows:

Q. Mr. Shamburger was never at any time served with a warrant in connection with these—with these instruments?

A. To my knowledge, no.

Q. And he was not served on January 19, 1995, with a warrant?

A. No.

Q. And he was not arrested on that date?

A. No.

Bethea. Pp. 42–43 (In accord, Michelle Shamburger, Vol. I at p. 250).

In light of the above foregoing conclusions, the Court is of the opinion that the Motion of the Defendant Grand is well taken and should be granted.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that the Motion of the Defendants, Grand Casino of Mississippi, Inc., *et al.* (Docket No. 53–1) for Summary Judgment, is hereby **GRANTED.**

**IT IS FURTHER ORDERED AND ADJUDGED** that all other pending motions, in this cause (specifically, Docket Nos. 48–1 and 63–1), are hereby **DENIED** as **MOOT.**

**IT IS FURTHER ORDERED AND ADJUDGED** that as all the claims and rights and liabilities of all the parties have been adjudicated in this cause, that a Final Judgment shall be entered in accordance with the foregoing Memorandum Order pursuant to Rule 58 of the Federal Rules of Civil Procedure and Rule 9 of the Uniform Local Rules of the United States District Courts for the Northern and Southern Districts of Mississippi, by August 20, 1998.