# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2021-CA-00612-COA

IN THE MATTER OF THE ESTATE OF NOEL              APPELLANT
ELBERT OBERT, DECEASED: MICHAEL
PETERSON, EXECUTOR OF THE ESTATE OF
NOEL ELBERT OBERT

v.

AABC PROPERTY MANAGEMENT, LLC,             APPELLEES
WEBSTER OBERT, AND TERESA OBERT

DATE OF JUDGMENT:            05/06/2021
TRIAL JUDGE:            HON. JAMES B. PERSONS
COURT FROM WHICH APPEALED:   HARRISON COUNTY CHANCERY COURT,
           SECOND JUDICIAL DISTRICT
ATTORNEY FOR APPELLANT:      WAYNE L. HENGEN
ATTORNEY FOR APPELLEES:      MICHAEL F. CAVANAUGH
NATURE OF THE CASE:        CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:            AFFIRMED - 12/13/2022
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McDONALD AND McCARTY, JJ.**

**BARNES, C.J., FOR THE COURT:**

¶1. Michael Peterson, as the executor of Noel Obert's estate, filed two complaints for collection on two promissory notes in the Harrison County Chancery Court. Peterson is married to Noel's daughter Susan. Noel's other children are Kathlene Obert and Webster (Web) Obert. Peterson filed a complaint against AABC Property Management LLC (AABC), a company owned and operated by Web, for an alleged default on payment of a promissory note in the principal amount of $700,000 involving a trailer park Web operated through AABC. Peterson filed another complaint against Web and his former wife Teresa

Obert for an alleged default on a promissory note in the full amount of $50,000 exchanged to finance a home in the trailer park.

¶2.    AABC asserted that Noel forgave the $700,000 debt based upon a handwritten note signed by Noel, which stated that in the event of his death by accident or sickness, the debt would be considered paid in full (i.e., forgiven). Peterson argued that the forgiveness note was inapplicable because Noel died by suicide, which could not be considered either an accident or sickness. The chancery court determined the forgiveness note was a holographic codicil to Noel's last will and testament. The court granted partial summary judgment in favor of Peterson, finding Noel's suicide could not be considered an accident for purposes of the codicil. However, the chancery court ruled that the issue of whether Noel died by sickness needed to be fully tried due to the unique factual situation presented—Noel had been diagnosed with prostate cancer the year before his death and also suffered from chronic pain and bouts of depression, and these sicknesses could have caused him to commit suicide.

¶3.    After a bench trial, the chancery court ruled that Noel's death was the result of sickness, finding "but for Noel's chronic pain, caused by the cancer and catheterization, he would not have committed suicide." Accordingly, the chancery court found under the holographic codicil that the $700,000 note to AABC was considered paid as of Noel's death. Further, the chancery court found Web and Teresa had paid the $50,000 house note in full, having made ten installments at six-percent interest. Both of Peterson's complaints were dismissed with prejudice.

¶4.    Peterson now appeals. He essentially raises two issues regarding the chancery court's

rulings, arguing Noel did not die by "sickness" under the terms of the codicil, and amounts due on both notes remain owed.

¶5.     Finding no error in the chancery court's judgment, we affirm.

**PROCEDURAL HISTORY**

¶6.     In January 2015, about a year and a half after Noel died, the chancery court entered an order granting Peterson the authority to pursue the balances allegedly due on the two promissory notes at issue. In June 2015, Peterson filed the complaints on behalf of Noel's estate, seeking collection of the two balances.[1]

¶7.     In response, AABC claimed that Noel forgave the trailer-park debt based upon the forgiveness note found among Noel's belongings after his death, as well as Noel's own statements that he wanted Web to have the trailer park free and clear at Noel's death. Also, Web and Teresa claimed the house note had been paid in full. By order entered in August 2018, the chancery court determined the forgiveness note was a central part of the litigation and a valid holographic codicil to Noel's will. The note was hand-written on an index card and executed by Noel on March 16, 2012. It stated: "In the event of my death accidental or by sickness prior to final payoff of the AABC (trailer park mortgage), the mortgage is to be considered paid in full on that date." The note was admitted to probate. In June 2019, Peterson filed a complaint for a declaratory judgment regarding the applicability of the codicil since Noel committed suicide. In July 2019, the chancery court entered an order

---

[1] Peterson sought recovery of the park loan's outstanding balance of $364,201.91, accrued interest, and attorney's fees. For the house loan, Peterson sought recovery of $28,736.24 owed on the loan, as well as interest and attorney's fees.

finding this determination could not be made until trial and authorizing the release of Noel's medical records.

¶8. In May 2020, Peterson filed a motion for summary judgment. In June 2020, the chancery court granted partial summary judgment, determining Noel's suicide was not an accidental death within the meaning of the codicil. However, the chancery court found the remaining issue of whether Noel's death by a self-inflicted gunshot would qualify as a death by "sickness" under the codicil would be decided at trial. If Noel's death was by sickness, the trailer-park debt was forgiven. The house debt was not addressed in this order.

¶9. In July 2020, Peterson filed a "Motion for Reconsideration and Revision of Order Granting in Part Motion for Summary Judgment," arguing no evidence showed Noel intended suicide to qualify as a sickness in his forgiveness note. Further, under Mississippi law, Peterson claimed that AABC, Web, and Teresa had to prove Noel's suicide was the result of an "irresistible impulse" substantially caused by his cancer and not by his own volition. In August 2020, the Defendants filed a memorandum in opposition to Peterson's motion. After a hearing, the chancery court denied Peterson's motion for reconsideration and revision.

¶10. In September 2020, both complaints were tried together. In May 2021, the chancery court entered a judgment, finding:

> Noel's death was the result of sickness[,] that being his prostate and bladder cancer and associated side effects of pain, frequent and constant catheterizations and depression all of which were compounded by his stated and longstanding pathological fear of prostate cancer and his father's death from prostate cancer at age 80.

4

The chancellor concluded that Noel died as a result of sickness within the meaning of the codicil; thus, the $700,000 note was forgiven; the chancellor further determined that the $50,000 house note had been paid in full.

## STATEMENT OF FACTS

¶11. On August 24, 2013, Noel, at age eighty-five, died on the top floor of the Beau Rivage parking garage in Biloxi, Mississippi, from a self-inflicted gunshot to the head. Noel had executed his last will and testament in October 2011, naming Peterson, his son-in-law, as executor. Noel left his estate in equal shares to his three adult children—Susan, Kathlene, and Web. Noel's wife predeceased him in 1996, dying of cancer. Upon Noel's death, his will was admitted to probate. His estate consisted of real and personal property, as well as financial investments.

¶12. In the 1980s, Noel retired from the United States Air Force with the rank of Chief Master Sergeant at Keesler Air Force Base in Biloxi. He and his wife moved off the base, purchased a trailer home, and moved it to a trailer park adjacent to the base. A few years later, Noel purchased the trailer park, developing it from twelve to sixty-five rental trailers. Noel also actively studied and invested in the stock market. His goal was to leave each of his children one million dollars; so he worked hard and lived frugally. His hobbies included repairing small engines and appliances, riding his bicycle, playing with his grandchildren, meeting friends and family for meals, and (after his wife died) visiting the casinos most days to dine and "dance with the ladies."

¶13. In August 1999, Noel sold the trailer park to AABC. Web, as sole owner of AABC,

5

executed a promissory note for $700,000 at an initial interest rate of six percent annually over twenty years. Web made monthly payments of $5,015.02 starting in October 1999 until August 2013, the month Noel died. While still married, Web and Teresa also financed one of Noel's trailer homes on Judge Sekul Avenue in Biloxi, executing a promissory note for $50,000 at an initial interest rate of six percent with monthly payments in the amount of $358.22 over twenty years. This note allowed for prepayment, and Web testified he paid the loan off in ten payments.

¶14.    In the years before his death, Noel was suffering from several health issues, but there was no evidence of any diminished mental capacity. In September 2012, Noel was diagnosed with "high-grade" prostate cancer that had spread to his bladder (but no other areas).[2] He also suffered from "benign prostatic hypertrophy" (BPH), for which he had been diagnosed in 1991 and again in 2008. BPH caused Noel to have difficulty voiding his bladder. He was treated with medications, underwent procedures, and had various types of catheters. In the year before his death, Noel was having to self-catheterize himself daily or more frequently. Sometimes he had to seek medical assistance at the hospital for catheterization.

¶15.    Keesler's medical records were entered into evidence at trial and detailed Noel's bouts of depression and health issues. As early as 1998, depression was listed as one of Noel's chronic illnesses, but he was not prescribed any medication at the time. An internal

_____

    [2]    Starting in October 2012, Noel began treatment for his prostate cancer with hormonal therapy injections every three months, but because of his advanced age, Noel declined surgery or radiation.

6

medicine record noted that Noel had lost ten pounds since his wife died two years earlier and had a decrease in mood. In September 1999, during his annual prostate check, medical records noted Noel "has [a] pathological fear of prostate [cancer]" and continued to have chronic BPH. Other records indicated that Noel's father had died of prostate cancer at the age of eighty. In January 2000, Noel reported to medical staff a lack of energy but no depressed mood. However, in September 2000, an internal medicine record noted "depressed NOS" (not otherwise specified). In April 2001, Noel was prescribed Zoloft after again complaining about depression (as well as an inability to concentrate, a lack of appetite, and a ten-pound weight loss among other symptoms) and missing his wife who had died five years earlier. Noel was on Zoloft for about one and one-half years. In 2004, depression was still listed as one of his several chronic illnesses on a medical-record form.

¶16.    In early October 2012, Noel first made suicidal comments to medical staff related to his prostate and bladder issues.[3] Noel went to the emergency room (ER) for problems with his Foley catheter, which was replaced. Medical records noted Noel had a history for several months of "significant urinary retention and difficulty voiding, for which he has undergone urethral stenting." Noel was given self-catheter supplies, but during a follow-up visit he told his physician that he was "very unhappy" with the pain involved and felt he would be unable to carry out the "self-cath regime." On a subsequent visit to the ER a few days later for continued prostate and bladder pain, Noel told nurses in the ER that he was miserable due

---

[3] In contrast, an internal medicine record in June 2011 stated his only complaint was fatigue after placement of a coronary stent in April 2011, and although he screened positive for depression, he reported that he was not thinking about suicide and generally felt well.

to the frequent self-catheterization (up to three times per hour at one point); "he wished he were dead"; and "if he had a gun he would already be dead." Because of these comments, Noel was placed on suicide-ideation protocol and observation. However, upon examination, Noel denied suicidal ideation and thus was removed from the protocol. A later medical record noted that Noel stated he made these threats of self-harm in order "to illustrate the severity of his pain."

¶17.    Medical records dated October 11, 2012, show Noel was admitted to the hospital for "urosepsis." Additionally, Noel's mood was evaluated to rule out or treat him for depression. During the mental evaluation, medical records show Noel admitted to "being upset about the pain in his bladder and . . . he really dislike[d] performing self-catheterizations," but Noel denied depression or suicidal ideation. Noel declined mental-health treatment.

¶18.    In the months before his death, Noel continued to suffer from pain. At the end of May 2013, Noel went to an internal medicine clinic for weakness, pain, and difficulty urinating. Medical records indicated Noel consistently had experienced these symptoms for about one month after a "stent exchange." Noel told medical staff he had a "sense of depression and suicidal ideation, but denie[d] a plan"; however, a physician was notified. In June 2013, Noel was admitted to the hospital for a urinary tract infection and "intractable pain." He was prescribed painkillers. In a mental-health assessment form, Noel indicated that in the previous two weeks he had felt "[l]ittle interest or pleasure doing things" and had been "[f]eeling down, depressed or hopeless" for several days. Noel stated, however, that

while his disinterest "in doing things" was increasing, "his feeling of depression [wa]s improving." He denied suicidal ideation.

¶19. At the end of July 2013, Noel visited a urology clinic because he had been unable to drain his bladder by self-catheterization. Noel was having severe pain after a Foley catheter was inserted and told medical staff if they did not remove it, he would. Noel also told the staff that "he was going to shoot himself if he had a gun." Medical staff tried to insert another Foley catheter without success. The urologist called Noel's daughter and expressed concern about Noel's "possible suicidal ideations" and suggested Noel should go to the ER for a psychiatric evaluation.

¶20. On July 27, 2013, however, one month before Noel died, an internal medicine record showed Noel was able to self-catheterize. The record discussed one of Noel's diagnoses as "adjustment disorder with depressed mood." The record noted Noel's daughter had "noticed some changes in the patient's mood since . . . [he was] diagnosed with cancer," but Noel denied suicidal ideation. Medical staff started Noel on a low dose of Zoloft again for "mood enhancement."

¶21. On August 22, 2013, two days before his death, Noel went to the ER for pain from hemorrhoids. The next day at his follow-up appointment, Noel reported that he was not using a catheter but had to strain to void. He also reported constant pain due to the cancer, lack of appetite, and significant weight loss during the last few months. He was advised to continue taking the painkiller Percocet. Although Noel denied suicidal thoughts at this visit, he screened positive for depression. A medical note regarding depression taken by Dr.

9

Richard Bennett stated, "Patient depressed about pain he is experiencing as a result of bladder and prostate cancer." Noel was thus advised to continue taking Zoloft. The medical record described his mood as "Dysthymic. Seems depressed."[4] Noel committed suicide the next day.

¶22.   Numerous witnesses testified at trial regarding Noel's personality and mental state. Peterson testified his relationship with Noel had always been "good," and they respected one another because they both had successful military careers. Noel had known Peterson since 1968 when Peterson and Susan began dating. Peterson testified that Noel was at his house routinely for Sunday dinners. Noel loved all three of his children and wanted them to be great successes, as he had been. Peterson also testified that Noel wanted them to "share equally." Noel was generous—he wanted his friends and family to succeed but could be a "little pushy" about advice. Peterson was shocked at Noel's suicide, testifying that Noel was the type of person who enjoyed life right up to the end.

¶23.   Susan testified that right after Web bought the trailer park, Web and Noel "butted heads a lot" about how to run the park. Susan claimed Noel sold Web the park to carry on the family name and make Web wealthy, but the park was not as successful with Web's running it. Susan testified that she was with Noel in September 2012 when he received the

---

[4] "Dysthymia" is also called persistent depressive disorder. It "is a continuous long-term (chronic) form of depression. You may lose interest in normal daily activities, feel hopeless, lack productivity, and have low self-esteem and an overall feeling of inadequacy. These feelings last for years and may significantly interfere with your relationships, school, work and daily activities." Mayo Clinic, Patient Care & Health Information, Diseases & Conditions, https://www.mayoclinic.org/diseases-conditions/persistent-depressive-disorder/symptoms-causes/syc-20350929 (last visited Dec. 12, 2022).

diagnosis of prostate cancer, and he handled it well (as was his character). Noel asked physicians pertinent questions about treatment and kept busy with his life. Susan testified that Noel's main complaint from 2012 until his death was the use of catheters, which caused him great pain. As far as his prostate cancer, Noel's numbers were improving, showing his cancer was in remission. Photographs taken in the months before his death and entered into evidence showed a smiling and laughing Noel posing with friends and enjoying his grandchild.

¶24. Richard Brock, Noel's friend of thirty years and a retired Air Force attorney, testified on behalf of Peterson. Brock testified that Noel did not complain, was optimistic, and was an enjoyable person to be around until the end. Brock also testified that Noel was conscientious and had high expectations of himself and others. Further, Noel never made comments about suicide and did not seem depressed, even in 2012 and 2013.

¶25. Another long-term friend from Noel's military days, Lawrence Fleming, testified on behalf of Peterson as well. He and Noel met for coffee weekly until about a week before Noel died. Fleming testified that Noel did not seem depressed. He also added that while Noel was a good friend, Noel was a "control freak" and could be "somewhat overbearing." Fleming testified that he believed it was Noel's intention to leave the trailer park to Web, as part of his inheritance, "free and clear." But Fleming also admitted that he did not know Web owed Noel money on the park loan through a promissory note with Noel. Fleming knew that Noel and Web had disagreed about how to run the trailer park. Noel would rent to anybody, but Web wanted to be more selective.

11

¶26. Web testified that Noel confided in him more than anyone else in the family. Web testified that he saw his father almost daily from September 2012 until his death, and Web believed Noel was mentally sound. At Web's last meal with Noel, within a month of his death, he and Noel discussed which pistol calibers would fail to penetrate a small animal skull. After the meal, Noel took Web to the top of the Beau Rivage parking garage where Noel could see his house in the distance. Noel told Web that this view was one of his favorites in Biloxi. Web also testified that a few months earlier, Noel had given him all but one of Noel's guns—the .22-caliber pistol used in his suicide. At the time, Noel told Web he had no need for his other guns. Web also testified that close to the time of Noel's death, Noel repeatedly told him a story about mercy-killing an animal. Web testified if he were in as much pain as his father, he would have killed himself much sooner than Noel did.

¶27. Web's second ex-wife, Teresa, testified that after their divorce in 2010, she saw Noel about twice a year and spoke with him several times a year. Teresa testified that they had discussed matters such as terminal illness and pain. Noel told her in 2012 and 2013 that he did not want to suffer like his wife had, but he wanted to end his life when nothing could be done. The last time Teresa spoke with Noel was around March 2013. She thought Noel sounded unwell, in pain, and more depressed than usual. Teresa also testified that Noel told her that when he died, "Web would get the park free and clear."

¶28. Noel's daughter Kathlene, a psychiatric nurse in Georgia, testified on behalf of AABC, Web, and Teresa. Kathlene testified that her father was smart, sharp, and had no decline in mental capacity during the last two years of his life. She knew he had been

diagnosed with depression but did not know its severity. She described his depression as "ongoing" and "relentless." Kathlene testified that Noel missed his wife but was not interested in a girlfriend. She testified that Noel hated being alone all the time and could not wait for the day he would be together again with his wife. Kathlene was aware of Noel's pain and troubles with the catheters. She testified that Noel also "hated being incapacitated and miserable and hurting." During the last two years and particularly the last month of his life, Noel was "more depressed and suicidal." Kathlene visited Noel the month before he died, and he gave her some personal belongings. She noted that is "the last thing somebody does before they kill themselves" and told her husband she did not think she would see Noel alive again. Kathlene testified that she believed her father's wishes were that Web's park loan be forgiven.

¶29. Web's first ex-wife, Ellen Simmons, kept in touch with Noel after her divorce from Web years ago. Ellen testified that after Noel's wife died, he was depressed "a lot." From August 2012 to August 2013, Ellen visited Noel every two weeks. Noel told Ellen that he had prostate cancer. Ellen testified that during her last visit with Noel in July 2013, Noel stated he would "blow his brains out" if the pain got any worse. During that visit, Noel also told Ellen he would not be around much longer; he could not take the pain; the catheters were unbearable; and if it got too bad "she knew what he would do."

¶30. Peterson hired Dr. Jule Miller III, a medical expert who was board certified in psychiatry. Dr. Miller provided an affidavit for Peterson's motion for summary judgment and was accepted as an expert at trial. Dr. Miller never met Noel and never interviewed

13

Web or Kathlene. Dr. Miller submitted an opinion letter in August 2019 and a supplemental letter in March 2020. He also wrote a "psychological autopsy" report, dated September 2020.[5]

¶31.  In his August 2019 opinion letter, Dr. Miller believed Noel did not die by accident or sickness, but he clearly "was tired of living with the pain and constant problems" from his urinary obstructions, which Dr. Miller did not consider a "sickness." Dr. Miller also found that Noel was a "proud" man, refusing to wear adult diapers or use a long-term Foley catheter. Dr. Miller did not believe Noel suffered from major depression that would lead to suicide and noted Noel often denied depression to physicians in 2012 and 2013. Dr. Miller noted that when Noel stated he wanted to shoot himself, Noel was "in acute pain or frustrat[ed] due to an inability to void," "repeated catheter failures," and/or "worsening health." Dr. Miller claimed that between those times, Noel appeared "to do well," carrying on with his life. However, Dr. Miller concluded:

> [T]hough [Noel] survived medical catastrophe after catastrophe, it was taking its toll. [Noel] could no longer taste food like he used to . . . , he was losing weight, he had to strain to void and then . . . it caused him to have painful hemorrhoids. I believe that was the last straw. At 85, with numerous medical problems, he decided life was no longer worth it and ended things on his terms. That was the act of a proud man, not a result of a sickness.

¶32.  In his March 2020 supplemental letter, Dr. Miller reiterated that Noel was never diagnosed with major depression, stating "This can easily be missed by someone looking at the records" because at times Noel reported "feeling depressed" about pain, "[b]ut those were [Noel]'s words," not medical professionals' words. Further, Dr. Miller wrote that

---

[5]  Both letters and the report were admitted into evidence at trial.

symptoms of depression do not make a diagnosis of depression; for example, Noel's insomnia and fatigue could have been symptoms of pain or cancer, not depression. Finally, Dr. Miller stated that "suicide is an act, not an illness"—a "choice born of individual personality"—and reiterated his opinion that Noel was a "proud man."

¶33.  In preparation for trial, Dr. Miller reviewed Noel's voluminous medical records, the police records, and the coroner's report. He also interviewed Peterson and Susan, read the depositions of Kathlene and Fleming, and studied publications on suicide. Dr. Miller testified that all the types of depression noted in Noel's medical records ("adjustment disorder with depressed mood," "dysthymic mood," and "depression NOS") were merely "generic," similar to sadness, and not an illness. Further, Dr. Miller testified that none of these conditions was the type of major depression that might cause someone to commit suicide.

¶34.  Dr. Miller testified that Noel's BPH was "a part of normal aging" after age eighty, and Dr. Miller dismissed Noel's comments to medical staff about killing himself due to pain and discomfort as merely dramatic statements to emphasize his degree of pain, such as a child would do to get attention and treatment. Dr. Miller testified these comments were consistent with Noel's "need for control" and maintained Noel was not actually suicidal.

¶35.  Dr. Miller did not deny that Noel had been diagnosed with chronic depression as far back as 1998. Further, Dr. Miller acknowledged numerous references to Noel's depression in the Keesler medical records, Noel's pathological fear of prostate cancer, and Noel's suicidal statements to medical staff, as well as his being prescribed opiate-based pain

medications. Even in Dr. Miller's "psychological autopsy report," Dr. Miller acknowledged that "[f]rom [Noel's] cancer diagnosis forward, the major problems he had involved problems voiding, problems with catheterization, and pain due to either a spastic bladder or the catheters." Dr. Miller testified that he believed Noel "had suicidal thoughts that he kept to himself all that whole year. I mean, who wouldn't, with that kind of pain and going downhill. I think that would be normal."

¶36. Peterson also hired Christy Pickering, a certified public accountant. She provided an affidavit for the summary judgment motion and was accepted at trial as an expert in accounting. In preparation for trial, Pickering reviewed the two promissory notes, Noel's bank account, tax returns from 1999 through 2013, affidavits, and discovery responses. A few days before trial, she submitted a report to Peterson's attorney with her opinion regarding the amounts due on the two promissory notes.

¶37. Pickering opined that neither note had been paid in full. She found the amount due on the $700,000 note as of trial was $442,513.82 and attorney's fees of $147,489.86. On the $50,000 note, she found the amount due was $40,912.48 and attorney's fees of $13,636.13. Pickering found expenses incurred in pursuing payment of the notes was $12,239.87, while Peterson's fees and mileage expenses totaled $54,067.

¶38. Pickering justified her report as follows. The original notes were found in Noel's residence at the time of his death with no notation that they had been paid in full. Further, no separate document of release or satisfaction was found for either note. In her opinion, Web made payments on both notes with the same check from April 1, 2010, through August

16

2013 (the month of Noel's death). No further payments were made on the notes, and no further bank deposits were recorded. Pickering noted a memo from Web to Noel dated April 1, 2010, where the interest rate on "the loan for the park" was changed from six percent to three percent. She prepared an amortization schedule reflecting this change, which she found was legitimate. She traced either a deposit slip and/or a bank-statement entry of the subject payments to support her findings.

¶39. In contrast to Web's claim that he paid off the house note early, Pickering opined the $50,000 house note had not been paid off. At trial, Pickering testified that the documents Web provided to show that he had made payment in full of the $50,000—receipts from Noel for the first four payments and records from Kessler Federal Credit Union—did not prove "by looking at them" that the $50,000 note had been paid off. Pickering testified, "[T]hey're payments toward something, but I don't know what it is."

¶40. Teresa and Web testified that the $50,000 house note had been paid off early in ten accelerated payments. Teresa prepared an amortization schedule creating a payment plan of ten installments at six-percent interest, which was entered into evidence. The monthly payments were $5,138.53, starting in October 1999. Teresa testified that after they made the payments, Noel personally told her "[Y]ou're paid off."

¶41. The chancellor issued a judgment several months after the trial, making the following findings related to his ruling that Noel died as a result of sickness within the meaning of the codicil. The chancellor noted the difference in opinion of Noel's friends and family on the level of pain and depression Noel experienced due to the cancer and catheters in the year

17

before his death from September 2012 to August 2013. Susan and Peterson testified that Noel's pain from catheters was not long-lasting. Peterson also testified that he did not observe any warning signs of depression or suicide. Kathleen, however, testified that during her last visit with her father in July 2013, Noel was in so much pain he could hardly walk and hurt too badly to dance at the casinos. Kathleen observed that Noel seemed increasingly depressed and told her that he did not know humans could feel such pain. Ellen and Teresa, Web's ex-wives, also testified that Noel was sick, in pain, depressed, and expressed suicidal ideation.

¶42. The chancellor also found that the medical records entered into evidence showed that in the year before his death, Noel returned to his doctors and the ER on multiple occasions due to pain from the catheters and prostate cancer. The chancellor noted that "[o]n more than one occasion, Noel emphasized the pain he was experiencing by stating that if it didn't stop he was going to shoot himself." He made these statements to both medical staff and family members. In addition, the chancellor found that Noel's medical records showed a pattern of Noel's reporting depressed feelings to medical staff, as well as treatment for depression in the form of antidepressants. Finally, the chancellor found, without elaboration, that Dr. Miller's opinion was not persuasive.

¶43. Ultimately, the chancery court held that Noel "died as a result of sickness within the meaning of Noel's forgiveness note"; thus, the $700,000 promissory note was considered paid. The chancery court also held that the $50,000 promissory note had been paid in full.[6]

---

[6] Findings related to the $50,000 loan will be discussed in detail later.

18

Accordingly, the chancery court dismissed both complaints with prejudice.

**ANALYSIS**

¶44. Peterson raises issues regarding the chancery court's failure to grant in full his motion for summary judgment, which were rendered moot by the trial on the merits. Peterson raises two related issues regarding the final judgment: whether the chancery court erred in ruling that Noel died as a result of "sickness" within the meaning of the codicil because "but for Noel's chronic pain, caused by the cancer and catheterization, he would not have committed suicide"; and whether the $50,000 house note had been paid in full.

    **I.    Whether Peterson's issues on appeal related to the partial summary judgment were rendered moot by a trial on the merits.**

¶45. Peterson was granted partial summary judgment on the issue of whether Noel died by "accident" under the terms of the codicil. The chancellor found Noel did not die from an accident. The chancery court deferred ruling on whether Noel died "by sickness" until trial to determine if Noel's death was "in some way motivated by his cancer." Peterson contends the chancery court erred by partially denying summary judgment, arguing the chancellor should have found Noel did not die by sickness, and the chancellor should have found that amounts of the two loans remain owed and are due. The gist of Peterson's argument is that he should have been granted summary judgment in full.

¶46. The chancellor, however, determined that full summary judgment was not appropriate at that point in the litigation, and the remaining issues needed to be tried. Peterson filed a motion for reconsideration, and at the hearing, Peterson's attorney requested that the chancellor certify his order partially denying the motion for summary judgment under Rule

54(b) so he could file an interlocutory appeal. The chancellor refused to do so, explaining that such a certification was not necessary, and the proper procedure was to request permission from the Mississippi Supreme Court to file an interlocutory appeal.[7] The record indicates Peterson never did, and the matter went to trial.

¶47. The chancery court's partial summary judgment in favor of Peterson was effectively a partial denial of Peterson's motion for summary judgment as well. This Court has held that an appeal from a denial of a motion for summary judgment is interlocutory in nature and is "subsequently rendered moot by the trial on the merits." *Gibson v. Wright*, 870 So. 2d 1250, 1254 (¶8) (Miss. Ct. App. 2004) (citing *Black v. J.I. Case Co. Inc.*, 22 F.3d 568, 569-70 (5th Cir. 1994)). "Once trial begins, summary judgment motions effectively bec[o]me moot." *Id.* (quoting *Daigle v. Liberty Life Ins. Co.*, 70 F.3d 394, 397 (5th Cir. 1995)). After the chancery court's partial denial of his motion for summary judgment and denial of his motion to reconsider, Peterson did not seek interlocutory review but instead proceeded to the trial on the merits. We conclude that Peterson's issues related to the partial summary judgment were "rendered moot by the trial on the merits." Accordingly, we do not address them; however, the substance of the issues are addressed below, albeit under a different standard of review.

II. **Whether the chancery court properly ruled Noel died "by sickness" within the meaning of the codicil.**

---

[7] The chancellor was correct that a Rule 54(b) certification was not necessary for Peterson to file a request for an interlocutory appeal with the supreme court. In fact, a Rule 54(b) certification would have indicated that the matter was final. *See* M.R.C.P. 54(b) (stating "the court may direct the entry of a final judgment").

20

¶48. Peterson argues that the chancellor erred in finding that "but for Noel's chronic pain, caused by the cancer and catheterization, he would not have committed suicide," and thus, Noel died "by sickness" under the meaning of the codicil. Peterson claims the chancellor thereby improperly found that Noel forgave the $700,000 loan under the codicil.

¶49. The chancellor stated his finding was supported by the medical records and the testimony of Web, Kathleen, Ellen, and Teresa about "Noel's increasing pain and depression during the last year of his life, as well as his repeatedly stated intentions to kill himself because of the pain he suffered." Further, the chancellor did not find Dr. Miller's opinion persuasive. Finally, the chancellor acknowledged that "[p]rior to his cancer diagnosis and the resulting pain, particularly from the catheters," Noel had an active life, riding his bicycle as well as dining and dancing at the casinos.

### *Standard of Review*

¶50. Mississippi law is clear that "when reviewing a chancellor's legal findings, particularly involving the interpretation or construction of a will, this Court will apply a de novo standard of review." *In re Last Will & Testament of Carney*, 758 So. 2d 1017, 1019 (¶8) (Miss. 2000) (citing *In re Est. of Homburg*, 697 So. 2d 1154, 1157 (¶10) (Miss. 1997)). This Court, however, "will not disturb a chancellor's factual determination that a condition has been satisfied absent an abuse of discretion." *Est. of Brill v. Phillips*, 76 So. 3d 709, 714-15 (¶¶22-23) (Miss. Ct. App. 2011) (holding a chancellor's determination that the beneficiary fulfilled the will's conditional bequest was not an abuse of discretion).

### *Will Construction and Intent of the Testator*

21

¶51. When construing the language of a will, "the paramount and controlling consideration . . . is to ascertain and give effect to the intention of the testator." *Est. of Brill*, 76 So. 3d at 714 (¶20) (quoting *In re Last Will & Testament of Lawson v. Lambert*, 792 So. 2d 977, 979 (¶7) (Miss. 2001)). "The surest guide to testamentary intent is the wording employed by the maker of the will." *Id.* (quoting *Tinnin v. First United Bank of Miss.*, 502 So. 2d 659, 663 (Miss. 1987)).

¶52. In this case, the chancellor did not express his opinion in terms of "will construction" or "intent of the testator." However, we find that he did perform the analysis correctly. First, the issue of will construction is whether suicide "causally related to the pain and depression resulting from Noel's cancer" is death caused "by sickness" within the meaning of Noel's forgiveness note. To this we apply a de novo review. Second, whether Noel did, in fact, kill himself for those reasons is a factual finding regarding satisfaction of a condition, which we review for an abuse of discretion.

¶53. In wills and codicils, "[i]f the language of the will is clear, definite, and unambiguous, the court must give to the language its clear import." *Id.* (quoting *Rousseau v. Rousseau*, 910 So. 2d 1214, 1219 (¶17) (Miss. Ct. App. 2005)). "[W]ords should be construed according to their ordinary and grammatical sense unless it is apparent that they were used in a different sense." Robert A. Weems, *Wills and Administration of Estates in Mississippi* § 8:14 (3d ed. 2003) (citing *Vannerson v. Culbertson*, 18 Miss. (10 S. & M.) 150 (1848)). "If the language of a will only allows one interpretation as to how the testator's property is distributed, the will is unambiguous, and courts may not consider parol evidence

to determine the intent of the testator." *In re Est. of Black*, 135 So. 3d 181, 183 (¶5) (Miss. Ct. App. 2013) (citing *Stovall v. Stovall*, 360 So. 2d 679, 681 (Miss. 1978)). "But if 'the language of the will itself can be construed to result in more than one interpretation as to the disposition of property,' the will is ambiguous." *Neill v. Earls*, 343 So. 3d 1071, 1076 (¶10) (Miss. Ct. App. 2022) (quoting *Est. of Regan v. Est. of LeBlanc*, 179 So. 3d 1155, 1159 (¶13) (Miss. Ct. App. 2015)). A word or phrase is considered "ambiguous" if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire document." *Id.* at 1076 n.4 (quoting *Smith v. Maggie Mae L.P.*, 225 So. 3d 1243, 1250 (¶29) (Miss. Ct. App. 2016)). An ambiguity arises, however, "only if the terms are 'susceptible to two *reasonable* interpretations.'" *Id.* (quoting *Est. of Smith v. Flowers*, 201 So. 3d 1099, 1105 (¶20) (Miss. Ct. App. 2016)).

¶54. Two types of ambiguities may arise in a will—patent and latent. *Id.* at 1076 (¶11).

> A patent ambiguity is one where 'a will or codicil is ambiguous on its face.' '[T]he words may be vague or confusing, or one provision may be in conflict with another.' *Latent ambiguity arises 'where the writing on its face appears certain, but the ambiguity is introduced by some matter outside of the instrument.'* 'Said differently, "a latent ambiguity occurs" where the devise of property is unclear or "remains uncertain when the language of the will is applied to the external facts" surrounding the testator.' A will may contain a latent ambiguity if the terms of the devise could reasonably be interpreted to 'apply to more than one item of property' or more than one beneficiary 'when the language of the will is applied to [the] external facts' of the testator.

*Id.* (citations omitted) (emphasis added).

¶55. Here, the terms of the codicil were not ambiguous on their face, but the application of the terms to the "external facts surrounding the testator" (Noel's diagnosis with cancer and thoughts of suicide due to painful health conditions) presents a latent ambiguity.

23

Peterson claims that Noel's intent, as hand-written in the codicil, was to forgive the loan "[i]n the event of [his] death . . . *by* sickness[,]" not *as a result* of sickness, as the chancellor found. Since Noel did not die "by" cancer or any of his other medical issues, but *by* suicide, Peterson contends that the codicil is inapplicable. We are not persuaded that this is the only reasonable interpretation of the codicil.

¶56.  Peterson argues that the chancellor's interpretation is incorrect and contrary to "a line of cases spanning sixty-five years regarding the law on suicide." Peterson claims that Noel's testamentary intent in the codicil was unambiguous—Noel did not intend for suicide to be considered a sickness under the terms of the codicil. For authority, Peterson cites three workers' compensation cases, one of which the chancellor cited, *Prentiss Truck & Tractor Co. v. Spencer*, 228 Miss. 66, 87 So. 2d 272, 278 (1956), and several wrongful death cases on the effect of suicide on recovery in tort.

¶57.  In *Prentiss*, the Mississippi Supreme Court found, in the workers' compensation context, that without the worker's injury, there would have been no suicide; therefore, the suicide was not an independent, freestanding act. Peterson correctly notes that *Prentiss* was the only authority cited in the chancery court's judgment, but he claims the case supports his position and not the Appellees' argument. In *Prentiss*, the supreme court affirmed the award of death benefits to a deceased worker's family after the worker committed suicide. *Prentiss*, 87 So. 2d at 273, 279. While employed as a shop mechanic, the decedent sustained a back injury when he fell at work. *Id.* at 273. During his hospitalization, physicians noted his mental condition was "nervous." *Id.* at 274. They also discovered the employee had a

24

preexisting disc injury, which the work injury exacerbated. *Id.* Two years after the accident, after numerous treatments, further hospital stays, and surgery, the employee was still "a very sick man," with no improvement in his physical condition. *Id.* at 275. He shot himself after yet another hospital stay. *Id.* Evidence showed that before his injury, he was good-natured, carefree, and healthy. But after his injury, he could not cope with his constant suffering due to the pain of his injuries and his mental state's being significantly deteriorated, to the extent that "all of the doctors classified him as a mental case." *Id.* Two doctors who treated the decedent testified that he was mentally unstable, suffered from "a mental disturbance of depressive insanity," and did not understand what he was doing or the consequences of his act when he killed himself. *Id.* Further, medical proof supported the claim that the decedent's suicide was causally related to the injuries he sustained while working, and had he not fallen, he might never have had trouble with the ruptured disc. *Id.* at 274-75, 278.

¶58. Peterson claims two other workers' compensation cases cited within *Prentiss* are instructive: *Voris v. Texas Employers Insurance Association*, 190 F.2d 929 (5th Cir. 1951),[8]

---

[8] In *Voris*, 190 F.2d at 930, a worker suffered painful burns to his face and hands and a "general shock of undetermined degree" after a vessel he was repairing exploded. The worker "developed manic-depressive insanity," shot himself and died seven months later. *Id.* Death benefits were awarded based on a finding that the worker killed himself "in a fit of mental despondence and depression" as a result of the explosion—the result "of an irrational state of mind and uncontrollable impulse." *Id.* The controlling question was whether the suicide was not the result of a willful intention to kill himself under the pertinent statute. *Id.* at 930-31; *cf. Prentiss*, 87 So. 2d at 276 (similar question on appeal). The federal appellate court found such support and effectively upheld the award of death benefits because it was reasonable to find the accident and injury caused depression, which caused the suicide; therefore, the suicide was not voluntary or willful under the meaning of the statute. *Voris*, 190 F.2d at 934-35.

25

and *Whitehead v. Keene Roofing Co.*, 43 So. 2d 464 (Fla. 1949).[9]

¶59.　Peterson argues that under *Prentiss*, *Voris*, and *Whitehead*, a court cannot find that a medical issue led to suicide without evidence that the medical issue caused the decedent to become mentally disturbed and void of judgment. Peterson distinguishes the outcome of these cases by arguing there is no evidence Noel was suffering from a manic-depressive type of mental condition or mental incapacity that would cause him not to know the consequences of his shooting himself. Peterson argues that since Noel's cancer or depression did not bring on such a mental disturbance, there was no connection attributing his suicide to his cancer or depression. Peterson claims that neither the medical records nor Dr. Miller's statements indicate Noel was "insane"; instead, Peterson maintains Noel made a voluntary and willful choice to commit suicide. Therefore, Peterson argues that Noel's suicide broke the chain of events between his cancer or depression and death (i.e. the suicide was an independent, intervening cause of death, not an "act" between the cancer or depression and his death).

¶60.　Peterson also cites several wrongful death cases involving the effect of suicide on recovery in tort, attempting to make them analogous to the situation here. For example,

---

[9] In *Whitehead*, the decedent fell from a roof on which he was working and sustained serious injuries. *Whitehead*, 43 So. 2d at 464. When he did not improve, about three months after the accident he swallowed poison and died a few days later. *Id.* The evidence showed the decedent suffered "excruciating pain" and some paralysis. *Id.* at 465. Before the accident he had been "a good-natured man," but after the accident he became "morose and ill-humored." *Id.* When asked at the hospital why he poisoned himself, he stated that he had "gone nuts." *Id.* The Supreme Court of Florida found the suicide was directly attributable to the injuries from the fall. *Id.* at 465. The court held that an award of death benefits was proper in cases where the incontrovertible evidence showed that without the injury, there would have been no suicide; in other words, the suicide was merely an intervening act between the injury and the death and part of an unbroken chain of events from the injury to the death. *Id.* at 465-66.

*Shamburger v. Grand Casino of Mississippi Inc./Biloxi*, 84 F. Supp. 2d 794 (S.D. Miss. 1998), the district court granted summary judgment in favor of the casino when the decedent committed suicide over gambling debts. *Id.* at 796, 803. The widow of a suicide victim sued the casino, which was a creditor of her husband, claiming wrongful death and emotional distress due to the casino's complaint to the district attorney about his debt. *Id.* at 796, 801-02. The district court granted the casino's motion for summary judgment, finding in part that the irresistible-impulse doctrine did not apply because the decedent acted voluntarily in his suicide. *Id.* at 799-800.

¶61.    The common law rule in tort is that suicide precludes recovery "where the resulting insanity following an injury" causes suicide "through a voluntary willful choice . . . even though the choice is dominated by a disordered mind." *Id.* at 798 (quoting *Voris*, 190 F.2d at 932-33). But Mississippi has recognized an exception to this rule, the "irresistible impulse doctrine," providing that "where the suicide is committed in response to an uncontrollable impulse, recovery may be had if the mental state of [the] deceased was substantially caused by the defendant's intentional wrongful acts . . . ." *Id.* at 798 (quoting *State ex rel. Richardson v. Edgewater*, 214 So. 2d 579, 587 (Miss. 1968)). In *Edgewater*, the supreme court quoted *Prentiss* in defining the irresistible impulse doctrine.[10] *Id.* The federal court

_____

[10] *Shamburger* cites *Edgewater* as analogous:

It was an issue of fact as to whether at the time the employee took his life he was suffering 'from a mental disturbance of depressive insanity and did not have the mental capacity to determine the consequences of his act.' If he took his own life through an uncontrollable impulse and without conscious volition to cause death, and the mental condition was caused by the injury, the death was compensable.

in *Shamburger* explained that the issue of fact was whether the decedent suffered from a "mental illness" that could produce an irresistible impulse, unlike a mere "mental condition," which is deemed voluntary and "sever[s] the causal chain linking suicide to wrongful conduct." *Id.* at 799.

¶62. Peterson argues that since there was no evidence Noel suffered from a mental illness like major depression, his suicide was voluntary and not due to an irresistible impulse. Further, Peterson states the evidence shows Noel fully considered committing suicide and planned for it. Therefore, Peterson concludes that Noel's death could not be due to "illness" under the codicil.

¶63. Peterson is correct that there is no indication Noel was "mentally disturbed" or "void of judgment." However, here we are interpreting neither workers' compensation statutes that prohibit recovery for voluntary acts of suicide nor a wrongful death case to determine whether the irresistible-impulse doctrine allows the plaintiff to recover in tort from a third party for the decedent's suicide. We are interpreting a codicil to a will. We do not find that "words . . . construed according to their ordinary and grammatical sense" would incorporate workers' compensation or irresistible impulse principles into Noel's codicil. *See* Weems *supra* ¶52, at §8:14. We agree with the chancery court that testamentary intent would not require the testator to continue to live in sickness and pain until a natural death came to him in order for the "by sickness" condition to be met. Rather, suicide due to chronic pain caused by cancer and catheterizations is within the meaning of this codicil's words "by

---

*Id.* at 799-800 (quoting *Edgewater*, 214 So. 2d at 587); *Prentiss*, 87 So. 2d at 279.

sickness."

### *Actual Cause of Noel's Suicide*

¶64.   Further, we cannot say that the chancellor abused his discretion in finding Noel's suicide was causally related to his debilitating medical issues of cancer, pain, BPH, and general depression. We find no reversible error in the reasoning that without these medical issues, there would have been no suicide; therefore, he died by sickness within the meaning of the codicil.

¶65.   The medical records show Noel was struggling with his various health issues and expressly threatening suicide to medical staff twice in the last year of his life. In the summer of 2012, Noel started having to use catheters. By October 2012, Noel made comments to medical staff that he wanted to shoot himself and wished he were dead, but later denied he was suicidal. He was hospitalized for pain from his bladder issues and urosepsis. In May 2013, Noel told staff at his internal medicine clinic that he was depressed and suicidal but denied having a plan. In June 2013, during a hospital stay for a UTI and severe pain, Noel admitted to feeling depressed in the past several days but stated he was improving. He denied suicidal ideation. By the end of July 2013, however, Noel told medical staff at his urology clinic he would shoot himself if he had a gun because his pain from the catheters was so unbearable. Again, he later denied suicidal ideation.

¶66.   The lay witnesses also gave conflicting testimony on Noel's mental state. Peterson was shocked Noel had committed suicide, and his wife Susan testified Noel handled his cancer diagnosis well but did complain about the pain from the catheters. Noel's friend

Brock testified Noel did not seem depressed and never complained. In contrast, Web's ex-wives, Teresa and Ellen, both testified that Noel had been depressed during the last year of his life, and he made comments about suicide to both of them. Web also testified about Noel's hunting and gun comments, which in hindsight Web related to a suicide plan. Finally, Web and Susan's sister Kathlene, a psychiatric nurse, testified she knew Noel had been diagnosed with depression, which had worsened in the last year of his life due to his health problems. She also testified that it was her opinion Noel was suicidal during the last month of his life.

¶67. We find it was within the chancellor's discretion to reject Dr. Miller's opinion on Noel's mental state, personality, and suicide as not persuasive. Peterson hired Dr. Miller, who never actually met Noel, Web, or Kathlene. Dr. Miller did not relate Noel's urinary obstructions, or chronic BPH, to a sickness, even though he opined Noel was "tired of living" because of its resulting pain and problems. Dr. Miller also acknowledged that Noel's survival of repeated "medical catastrophes" and diminishment of life's simple pleasures was taking its toll on Noel, but Dr. Miller attributed his suicide to being "proud" and not the result of sickness. Further, Dr. Miller suggested only "major depression" could lead to suicide, and lesser forms of depression, which Noel had, could not be considered "sickness." The chancellor discounted Dr. Miller's opinions just as Dr. Miller discounted Noel's comments regarding suicide to medical staff as mere "dramatic statements" to gain attention. The chancellor did not abuse his discretion in determining that "but for Noel's chronic pain, caused by his cancer and catheterizations, he would not have committed suicide."

30

Accordingly, we find no reversible error in the chancery court's determination that Noel died "by sickness" within the meaning of the codicil and that the remainder of the note was forgiven.

### III. Whether the chancery court erred in finding the $50,000 house note was paid in full.

¶68. Peterson argues that Web did not meet his burden of proving the $50,000 house note was paid in full. Further, his expert Pickering's opinion was that the loan had not been paid off, and all amounts were due.

¶69. This Court will not disturb a chancellor's factual findings "unless the findings were manifestly wrong or clearly erroneous or the chancellor applied an erroneous legal standard." *Davis v. Longo*, 315 So. 3d 1080, 1082 (¶13) (Miss. Ct. App. 2021) (citing *Est. of Labasse v. Labasse*, 242 So. 3d 167, 170 (¶9) (Miss. Ct. App. 2017)).

¶70. The chancellor found the record reflected Web and Teresa made ten payments, each in the amount of $5,138.53. The original note, found in Noel's home after his death, had no markings indicating it had been paid in full, but the chancellor found this fact was not persuasive evidence the note was unpaid given Noel and Web's relationship as father and son. Importantly, the chancellor noted "there was no evidence Noel ever complained to Web or Teresa that the note was delinquent or took any action consistent with the note not being paid . . . ."

¶71. In suits to collect notes, "[i]t is well settled that the burden of proving payment is upon [the party] who asserts it." *Garrett v. Pigford*, 218 Miss. 840, 844, 67 So. 2d 885, 887 (1953). "It is an affirmative defense." *Tate v. Rouse*, 247 Miss. 545, 547, 156 So. 2d 217,

218 (1963). Peterson argues a presumption is in his favor: "where the maker of the note swears that he has paid it and the holder of the note swears that it has not been paid, the presumption arising from the fact of possession of the uncancelled note by the party claiming should be regarded as turning the scale in his favor . . . ." *Hans v. Wiesenburg*, 237 Miss. 351, 354-55, 114 So. 2d 849, 851 (1959).

¶72.     Both parties agree that Web had the burden of proving the house note was paid. Peterson, however, claims that all the evidence Web offered to prove the note had been paid had no relation to payment of the $50,000 note. We disagree.

¶73.     Teresa's amortization schedule of ten payments of $5,138.53 at six-percent interest was entered into evidence. Web and Teresa testified that they started payments in October 1999. Web testified that he paid the note by handing the checks or cash to Noel. The note was originally for twenty years, but Web testified it was always his intention to pay the house off early. Web and Noel decided to spread payments out over ten months. At trial, Web tied the amortization schedule payments to the payments made. Receipts for the first four payments were entered into evidence, each for the accelerated payment amount of $5,183.53 from October 1999 until January 2000. Each receipt was dated, signed by Noel, and included the previous balance, amount paid, and balance due, as well as the payment number.

¶74.     For the remaining six payments, there were no receipts, but Web testified about each payment in detail and provided Keesler Federal Credit Union statements, which were entered into evidence to show the date, amount, and type of withdrawal for each payment. Web

32

testified the fifth payment was made on February 3, 2000, by cashier's check. He offered into evidence a Keesler Federal Credit Union cashier's check stub on the same date in the amount of $5,000 disbursed to "Monument Funds." Web testified that this fund was one of Noel's accounts where Web was instructed to deposit the payment. Web explained the sixth payment, on March 1, 2000, was a withdrawal by check for $5,500 from his personal bank account. The seventh payment was made by cashier's check for $5,138.53 on April 3, 2000, per Noel's instruction. The eighth payment Web testified was made on May 3, 2000, by cashier's check to Noel for $5,138.53. Web offered into evidence the check stub, a "yellow sheet" copy of the check, and a People's Bank joint account statement among Noel, Susan, and Kathleen, showing a deposit of $5,165.03 on the same date, which Web admitted was higher than what he had given Noel. The ninth payment was made on June 5, 2000, by check. Web entered into evidence a Kessler Credit Union statement showing the withdrawal and another "yellow sheet" copy of the check. The last payment Web testified was dated July 1, 2000, for $5,138.53 from his checking account. He offered a carbon copy of his checkbook receipt as proof.

¶75. Pickering claimed, regarding the first four payments, that they were not traceable back to the $50,000 note, they were not consistent with the terms of the note, and nothing showed that the payment terms of the note were changed. For the remaining payments, she noted there were no receipts. Further, she testified that the back of the checks were not shown and that the receipts reference a note dated August 10, 1999, but the house note is dated August 12, 1999. Pickering also noted that the April 1, 2010 memo states that "the

new payment is $4,674.00 . . . monthly." However, according to Pickering's amortization schedule, the new payment for the loan on the park would be $4,315.78. The sum of this amount and the house note payment of $358.22 per month is $4,674, which Pickering claims indicates the house note had not been paid off.

¶76. At trial, the chancellor noted that the only issue regarding Web's proof of payments was whether there could be a third note that Web was paying off, but Pickering could not establish that there was one. Further, the reference of a note executed on August 10, 1999, instead of August 12, 1999, could well have been a typo. The chancellor found it "hard to believe" that Web was writing these ten checks without its being applied to the house note, and we agree. Even if there was an error in Teresa's computation of the amortization of ten payments, as long as Web showed a payment that could be applied to the house note, Web was credited for it. There was no requirement for Noel or Web to keep receipts of the payments on the note. As far as Pickering's supposition that Web made payments on both the park and the house note with one check through August 2013, she provides no documents this was the case. Accordingly, the chancellor did not abuse his discretion in finding that there was substantial evidence the house note was paid in full.

¶77. **AFFIRMED.**

**CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**